## LEVINSON *v.* SPECTOR MOTOR SERVICE.

No. 22. Argued December 11, 1945. Reargued October 21, 22, 1946.—Decided March 31, 1947.

650

*Harry L. Yale* argued the cause for petitioner.    With him on the brief was *Richard S. Folsom.*

*David Axelrod* argued the cause for respondent on the original argument and *Roland Rice* on the reargument. With them on the briefs were *Harry J. Lurie* and *Maurice P. Golden.    Peter T. Beardsley* was also on the brief on the reargument.

By special leave of Court, *Jeter S. Ray* argued the cause for the Administrator of the Wage and Hour Division, United States Department of Labor, as *amicus curiae,* on the reargument. With him on the brief was *William S. Tyson.*

By special leave of Court, *Daniel W. Knowlton* argued the cause and filed a brief for the Interstate Commerce Commission, as *amicus curiae,* on the reargument.

Mr. Justice Burton delivered the opinion of the Court.

This case presents the question whether the Interstate Commerce Commission has the power, under § 204 of the Motor Carrier Act, 1935,[1] to establish qualifications and maximum hours of service with respect to any "checker" or "terminal foreman," a substantial part of whose activities in that capacity consists of doing, or immediately

---

[1] The material parts of § 204 are:

"Sec. 204 (a) It shall be the duty of the Commission—

"(1) To regulate *common carriers* by motor vehicle as provided in this part, and to that end the Commission may establish reasonable requirements with respect to continuous and adequate service, transportation of baggage and express, uniform systems of accounts, records, and reports, preservation of records, *qualifications and maximum hours of service of employees, and safety of operation and equipment.*

"(2) To regulate *contract carriers* by motor vehicle as provided in this part, and to that end the Commission may establish reasonable requirements with respect to uniform systems of accounts, records, and reports, preservation of records, *qualifications and maximum hours of service of employees, and safety of operation and equipment.*

"(3) To establish for *private carriers of property* by motor vehicle, if need therefor is found, reasonable requirements to promote *safety of operation, and to that end prescribe qualifications and maximum hours of service of employees, and standards of equipment. . . ."* (Italics supplied.)    49 Stat. 546, 49 U. S. C. § 304 (a) (1), (2) and (3).

directing, the work of one or more "loaders" of freight for an interstate motor carrier as such class of work is defined by the Interstate Commerce Commission in *Ex parte No. MC–2*, 28 M. C. C. 125, 133–134,[2] although the rest of his activities do not affect the safety of operation of any such motor carrier.[3]

---

[2] "(*2*) *Loaders.*— . . .

"The large carriers, . . . particularly those who have important operations from terminal to terminal, employ men variously called loaders, dockmen, or helpers, and hereinafter called loaders, whose sole duties are to load and unload motor vehicles and transfer freight between motor vehicles and between the vehicles and the warehouse.

"The evidence makes it entirely clear that a motor vehicle must be properly loaded to be safely operated on the highways of the country. If more weight is placed on one side of the vehicle than on the other, there is a tendency to tip when rounding curves. If more weight is placed in the rear of the vehicle, the tendency is to raise the front wheels and make safe operation difficult. Further, it is necessary that the load be distributed properly over the axles of the motor vehicle.

"Proper loading is not only necessary when heavy machinery, steel, and other like commodities are being transported, but is of importance when normal package freight is handled. If several packing cases weighing from 150 to 200 pounds are loaded on one side of a motor vehicle or at one end thereof, and lighter freight on the other side or at the other end, safe operation is difficult. The great majority, if not all, of the carriers whose operations are of sufficient size or character to justify the employment of loaders handle freight of such weight that proper loading is necessary." *Ex parte No. MC–2*, 28 M. C. C. 125, 133–134.

[3] Throughout this case it has been recognized that it was within the power of the Commission to establish the qualifications and maximum hours of service for the regular "loaders" who served under the immediate direction of the petitioner. No claim has been made on their behalf to the benefits of § 7 of the Fair Labor Standards Act. The present controversy is limited to the status of the petitioner himself. His status is referred to throughout this opinion as that of a "partial-duty loader," except where he is referred to by his own designation of himself as a "checker" or "terminal foreman." The term "partial-duty loader" is used in preference to that of "part-

We hold that the Commission has that power and that § 13 (b) (1) of the Fair Labor Standards Act[4] therefore expressly excludes any such employee from a right to the increased pay for overtime service prescribed by § 7 of that Act.[5]

In this action, brought in the Municipal Court of Chicago, pursuant to § 16 (b) of the Fair Labor Standards Act,[6] the petitioner recovered judgment against his em-

---

time loader," so as to avoid the implication that time spent in certain activities, rather than the character of those activities, is to be the conclusive factor in deciding whether or not the individual is subject to the jurisdiction of the Commission.

[4] "SEC. 13. . . .

"(b) The provisions of section 7 shall not apply with respect to (1) any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 204 of the Motor Carrier Act, 1935; . . . ." 52 Stat. 1068, 29 U. S. C. § 213 (b) (1).

[5] "SEC. 7. (a) No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce—

"(1) for a workweek longer than forty-four hours during the first year from the effective date of this section,

"(2) for a workweek longer than forty-two hours during the second year from such date, or

"(3) for a workweek longer than forty hours after the expiration of the second year from such date,

unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 52 Stat. 1063, 29 U. S. C. § 207 (a).

[6] "SEC. 16. . . .

"(b) Any employer who violates the provisions of . . . section 7 of this Act shall be liable to the employee or employees affected in the amount of . . . their unpaid overtime compensation, . . . and in an additional equal amount as liquidated damages. . . . The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 52 Stat. 1069, 29 U. S. C. § 216 (b).

ployer, the respondent, for $487.44 for unpaid overtime compensation for petitioner's services, as a "checker" or "terminal foreman," computed in accordance with § 7 of that Act. In addition, the judgment included $487.44, as liquidated damages, and $175 as an attorney's fee, making a total of $1,149.88 and costs. The defense was that, under § 13 (b) (1), the provisions of § 7 did not apply to the petitioner's service. On that ground, the judgment was reversed by the Appellate Court of Illinois and the cause remanded with directions to enter judgment, with costs, for the respondent. 323 Ill. App. 505, 56 N. E. 2d 142. The Supreme Court of Illinois affirmed. 389 Ill. 466, 59 N. E. 2d 817. We granted certiorari because of the importance of the question in interpreting the Motor Carrier Act and Fair Labor Standards Act. 326 U. S. 703. It was argued at the October Term, 1945, of this Court and, on January 2, 1946, was restored to the docket for reargument before a full bench at this Term. It was so argued on October 21 and 22, 1946. In addition to the briefs and arguments on behalf of the parties, we have had the benefit of those presented, at our request, on behalf of *amici curiae.* These were from the Administrator of the Wage and Hour Division, United States Department of Labor, who supported the position of the petitioner, and, on the other hand, from the Interstate Commerce Commission which claimed that it possessed, under the Motor Carrier Act, the power to establish qualifications and maximum hours of service with respect to the petitioner. The Solicitor General, also at our request, filed a memorandum. In it he supported the petition for certiorari and took what he has described as "a position somewhat between that of the Commission and that of the Wage and Hour Administrator."

The respondent is a Missouri corporation, licensed in Illinois, and engaged in interstate commerce as a motor carrier of freight. It does not appear whether the re-

spondent is a common carrier, contract carrier or private carrier of property. The result, however, does not turn upon differences between those classifications. The petitioner was employed by the respondent from October 1, 1940, through October 6, 1941, in one or more capacities which he designates generally as those of a "checker" or "terminal foreman." While the evidence is conflicting as to some of his duties, there is ample to sustain the judgment of the Supreme Court of Illinois on the basis that a substantial part of his activities consisted of doing, or immediately directing, the work of one or more "loaders" of freight for an interstate motor carrier as that class of work is defined by the Interstate Commerce Commission. The Supreme Court of Illinois accepted the Appellate Court's description of petitioner's activities.[7] The power of the

---

[7] See note 2 for the Commission's general definition of the work of "loaders." The Appellate Court of Illinois described the petitioner's activities as follows:

"Plaintiff [petitioner] contends he is a checker, not a loader, and therefore, not within the Commission's interpretation. We believe that his duties—not the name given his position—are determinative. . . .

"Defendant Terminal at 600 West 25th Street, Chicago, is the scene of three phases of motor carrier business—inbound freight, outbound freight and local freight. Trucks carrying freight originating locally and in foreign cities and States, are unloaded by gangs of defendant's employees. A gang usually consists of 3 or 4 men—a checker, caller, sorter and packer. The checker directs the gang's operation. Day and night foremen supervise the activities of all the gangs. Incoming freight is unloaded and deposited according to its destination on the dock in various sections at the direction of the checker; likewise under the direction of the checker, it is removed from these sections and loaded on appropriate outgoing trucks. It is loaded according to size and weight; heavy weighted or 'bottom freight' being distributed in the lower part of the truck and lighter weighted or 'balloon freight' is placed at the top. This plan is followed in the interest of safety of equipment and of freight. Testimony pertinent to the issue on the merits is that, as checker, plaintiff supervised and directed the unloading and disposition of incoming freight and the collecting and loading of the outgoing freight and

Commission to establish qualifications and maximum hours of service with respect to such "loaders" has been defined and delimited by it in a series of well-considered decisions, dating from the extension of its jurisdiction, in 1935, so as to include motor carriers.

that he watched the disposition of the weight of the freight in loading. The dispute in the testimony arises as to the quantity of plaintiff's activities devoted to these particular duties. Plaintiff says that most of the outbound freight was handled at night, while he worked mostly days; that not much loading was done during his hours, but that, whatever took place, was under his direct charge. The defense testimony is that inbound and outbound freight was equally divided during the day—inbound usually during the night and outbound between 8 a. m. and midnight.

". . . There is no question that some part of plaintiff's work week was devoted to the direction and supervision of the loading of interstate motor freight carriers. There is no question either that the loaders in his gang were exempted from section 7 of the Fair Labor Standards Act. We think, therefore, that with greater force, plaintiff comes within the exemption for, if the loaders are exempt because the manner in which they work affects the safety of the operation of defendant's motor vehicles, certainly the duties of plaintiff, who planned and directed the loading, affect that safety. Considering the purpose of the Motor Carriers Act, we believe that the true determinant is whether an employee performs any duties which substantially affect the safety of operation, rather than whether the duties affecting safety are substantial." *Levinson* v. *Spector Motor Service,* 323 Ill. App. 505, 507, 508–509, 56 N. E. 2d 142, 143, 144.

The Supreme Court of Illinois said:

"We think the question of fact to be properly determined in this case is whether or not a substantial part of plaintiff's work affects safety of operation of motor vehicles, and that this question of fact controls this case. If it be determined from the evidentiary facts that plaintiff, in a substantial part of his work, was engaged in safety of operation of motor vehicles, or the cargo thereof, he would be exempted from the Fair Labor Standards Act, as a matter of law.

.     .     .     .     .

". . . under the facts as found by the [Appellate] court, the employee came within the same exemption as loaders, dockmen and helpers." *Levinson* v. *Spector Motor Service,* 389 Ill. 466, 473–474, 59 N. E. 2d 817, 820.

The history of the development of the congressional safety program in interstate commerce, up to and including the enactment of the Motor Carrier Act in 1935 and the Fair Labor Standards Act in 1938, tells the story.

In comparable fields, Congress previously had prescribed safety equipment, limited maximum hours of service and imposed penalties for violations of its requirements.[8]  In those Acts, Congress did not rely upon increases in rates of pay for overtime service to enforce the limitations it set upon hours of service.   While a requirement of pay that is higher for overtime service than for regular service tends to deter employers from permitting such service, it tends also to encourage employees to seek it.   The requirement of such increased pay is a remedial measure adapted to the needs of an economic and social program rather than a police regulation adapted to the rigid enforcement required in a safety program.   *Overnight Motor Co.* v. *Missel,* 316 U. S. 572, 577–578.

By 1935, 40 states had attempted to regulate safety of operation of carriers by motor vehicle.   Some had established qualifications and maximum hours of service for

[8] The *Safety Appliance Acts,* approved March 2, 1893, 27 Stat. 531; March 2, 1903, 32 Stat. 943; April 14, 1910, 36 Stat. 298; and February 28, 1920, 41 Stat. 499; see Title 45, U. S. C.—Railroads, and 49 U. S. C. § 26, all relate to railroads and are enforced by the Interstate Commerce Commission.

The *Hours of Service Act,* approved March 4, 1907, 34 Stat. 1415, 45 U. S. C. § 61, requires the Interstate Commerce Commission to enforce maximum hours of service for railroad employees engaged in the movement of trains.   It includes also operators, train dispatchers and others having much to do with the safety of train movements although not riding the trains.

The *Seamen's Act,* approved March 4, 1915, 38 Stat. 1164, see 46 U. S. C. § 673, prescribes maximum hours of service at sea and at anchor for sailors, firemen, oilers and others engaged in sailing or managing vessels.   It establishes qualifications for seamen and prescribes crew requirements, safety equipment and sanitary facilities for certain types of vessels.

drivers and helpers. Increased interstate movements of motor carriers then made necessary the *Motor Carrier Act, 1935,* approved August 9, 1935, as Part II of the Interstate Commerce Act, 49 Stat. 543. This Act vested in the Interstate Commerce Commission power to establish reasonable requirements with respect to qualifications and maximum hours of service of employees and safety of operation and equipment of common and contract carriers by motor vehicle. § 204 (a) (1) (2). Similar, but not identical, language was used as to private carriers of property by motor vehicle. § 204 (a) (3). The Act expressly superseded "any code of fair competition for any industry embracing motor carriers . . . ." § 204 (b). Section 203 (b) listed many types of motor carriers which were exempted in general from the Act but that Section significantly applied to all of them the provisions of § 204 as to qualifications, maximum hours of service, safety of operation and equipment.[9]

---

[9] "SEC. 203. . . .

"(b) Nothing in this part, *except the provisions of section 204 relative to qualifications and maximum hours of service of employees and safety of operation or standards of equipment* shall be construed to include (1) motor vehicles employed solely in transporting school children and teachers to or from school; or (2) taxicabs, or other motor vehicles performing a bona fide taxicab service, having a capacity of not more than six passengers and not operated on a regular route or between fixed termini; or (3) motor vehicles owned or operated by or on behalf of hotels and used exclusively for the transportation of hotel patrons between hotels and local railroad or other common carrier stations; or (4) motor vehicles operated, under authorization, regulation, and control of the Secretary of the Interior, principally for the purpose of transporting persons in and about the national parks and national monuments; or (4a) motor vehicles controlled and operated by any farmer, and used in the transportation of his agricultural commodities and products thereof, or in the transportation of supplies to his farm; or (4b) motor vehicles controlled and operated by a cooperative association as defined in the Agricultural Marketing Act, approved June 15, 1929, as amended; or (5) trolley busses operated by electric power derived from a fixed overhead wire,

It is even more significant that in 1942, several years after enactment of the Fair Labor Standards Act of 1938, Congress slightly, but expressly, expanded the jurisdiction of the Commission over these subjects of qualifications, maximum hours of service, safety of operation and equipment and thereby restricted, to a corresponding degree, the application of the compulsory overtime provisions of the Fair Labor Standards Act.[10]

furnishing local passenger transportation similar to street-railway service; or (6) motor vehicles used exclusively in carrying livestock, fish (including shell fish), or agricultural commodities (not including manufactured products thereof); or (7) motor vehicles used exclusively in the distribution of newspapers; nor, unless and to the extent that the Commission shall from time to time find that such application is necessary to carry out the policy of Congress enunciated in section 202, shall the provisions of this part, *except the provisions of section 204 relative to qualifications and maximum hours of service of employees and safety of operation or standards of equipment apply to:* (8) The transportation of passengers or property in interstate or foreign commerce wholly within a municipality or between contiguous municipalities or within a zone adjacent to and commercially a part of any such municipality or municipalities, except when such transportation is under a common control, management, or arrangement for a continuous carriage or shipment to or from a point without such municipality, municipalities, or zone, and provided that the motor carrier engaged in such transportation of passengers over regular or irregular route or routes in interstate commerce is also lawfully engaged in the intrastate transportation of passengers over the entire length of such interstate route or routes in accordance with the laws of each State having jurisdiction; or (9) the casual, occasional, or reciprocal transportation of passengers or property in interstate or foreign commerce for compensation by any person not engaged in transportation by motor vehicle as a regular occupation or business." (Italics supplied.)    49 Stat. 545, 49 U. S. C. § 303 (b).

[10] A new § 202 (c) was inserted in the Motor Carrier Act by the Transportation Act of 1940, 54 Stat. 920, so as to exclude from the Motor Carrier Act certain motor vehicle pickup and delivery service within terminal areas.  This exclusion automatically put certain employees, who were engaged in that service, beyond the power of the Interstate Commerce Commission to establish their qualifications and maximum hours of service under § 204 of the Motor

In 1940, this Court, in *United States* v. *Amer. Trucking Assns.*, 310 U. S. 534, recognized the emphasis given by Congress to the clause "qualifications and maximum hours of service" in §§ 204 (a) and 203 (b). That decision reviewed the legislative history of the Act and held "that the meaning of employees in § 204 (a) (1) and (2) is limited to those employees whose activities affect the safety of operation. The Commission has no jurisdiction to regulate the qualifications or hours of service of any others." *Id.* at 553. The opinion dealt with employees who devoted themselves exclusively to their respective assignments, such as those of drivers on the one hand or of clerks on the other. It demonstrated that § 204 (a) (1) and (2) related to the former but not to the latter.[11] It did not discuss its relation to employees who, as in the present case, are required to divide their activities between those affecting safety of operation and those not affecting it.

---

Carrier Act. The Administrator of the Wage and Hour Division, United States Department of Labor, thereupon regarded some of them as entitled to the benefits of § 7 of the Fair Labor Standards Act as to compulsory overtime pay. However, when this new § 202 (c) was amended by the Act of May 16, 1942, 56 Stat. 300, 49 U. S. C. Supp. V, § 302 (c), to include freight forwarders, Congress also added to it a general clause to the effect that "the provisions of section 204 relative to qualifications and maximum hours of service of employees and safety of operation and equipment" should apply to the exempted operations. This amendment was an express recognition by Congress of the need for control by the Commission over the qualifications and maximum hours of service of these employees in the interests of public safety, although its provision for that control automatically deprived those employees of their recently acquired private rights to higher overtime pay under § 7 of the Fair Labor Standards Act.

[11] In *Overnight Motor Co.* v. *Missel*, 316 U. S. 572, an employee who served an interstate motor carrier as a rate clerk and performed other incidental duties, none of which were connected with safety of operation, was given judgment for the overtime compensation prescribed by § 7 of the Fair Labor Standards Act.

In *Southland Co.* v. *Bayley*, 319 U. S. 44, this Court applied similar reasoning to an employee of a private carrier of property under § 204 (a) (3). It recognized the Commission's power to find a need for its action and, having found it, to establish qualifications and maximum hours of service for employees of private motor carriers of property affecting the safety of operation of such carriers. It held that, under § 13 (b) (1) of the Fair Labor Standards Act, the Commission's mere possession of that power, whether exercised or not, necessarily excluded all employees, with respect to whom the power existed, from the benefits of the compulsory overtime provisions of § 7 of that Act. The present case involves a comparable situation in that the Commission has found here that it has the power to establish qualifications and maximum hours of service for those doing the work of loaders for common or contract motor carriers or private motor carriers of property, but it has not found it advisable, as yet, to establish qualifications and maximum hours of service for that work.

The logic of the situation is that Congress, as a primary consideration, has preserved intact the safety program which it and the Interstate Commerce Commission have been developing for motor carriers since 1936. To do this, Congress has prohibited the overlapping of the jurisdiction of the Administrator of the Wage and Hour Division, United States Department of Labor, with that of the Interstate Commerce Commission as to maximum hours of service. Congress might have done otherwise. It might have permitted both Acts to apply. There is no necessary inconsistency between enforcing rigid maximum hours of service for safety purposes and at the same time, within those limitations, requiring compliance with the increased rates of pay for overtime work done in excess of the limits set in § 7 of the Fair Labor Standards Act. Such

overlapping, however, has not been authorized by Congress [12] and it remains for us to give full effect to the safety program to which Congress has attached primary importance, even to the corresponding exclusion by Congress of certain employees from the benefits of the compulsory overtime pay provisions of the Fair Labor Standards Act. When examined from the point of view of the Motor Carrier Act alone, much light is thrown on the meaning of its § 204 by the interpretation given to it and the applications made of it by the Interstate Commerce Commission.

The reports and regulations of that Commission, issued under authority of Part II of the Interstate Commerce Act, both before and after the enactment of the Fair Labor Standards Act, deal so thoroughly and expertly with the safety of operation of interstate motor transportation as to entitle them to especially significant weight in the interpretation of this Act, the enforcement of which has been committed by Congress solely to that Commission.

The principal reports and regulations of the Commission, bearing upon the present controversy, are the following: [13]

---

[12] See note 27, *infra*.

[13] Shortly after the Act became effective, the Commission, on its own motion, instituted the *Ex parte* proceedings listed below. These resulted in many hearings, examiners' reports and divisional and Commission reports thoroughly and comprehensively covering the subjects investigated. Further comparable investigations directed by the Section of Safety of the Bureau of Motor Carriers of the Interstate Commerce Commission are pending. One of these is to determine what, if any, qualifications and maximum hours of service should be established by the Commission for mechanics, loaders and helpers.

*Ex parte No. MC-2*, Order of July 30, 1936. This related to *maximum hours of service* of employees engaged in motor carrier transportation and to regulations as to such hours of service pursuant to § 204 (a) (1), (2) and (3). See 3 M. C. C. 665, 666. It dealt with *drivers* for common and contract carriers. It led to the holding that *mechanics, loaders* and *helpers* are within the jurisdiction of the Com-

December 23, 1936. 1 M. C. C. 1. *Ex parte No. MC-4* established qualifications for drivers of interstate, common or contract carriers by motor vehicle, outlined a long-term safety program and issued regulations as to safety of operation and equipment, constituting Parts, I, II, III and IV of motor carrier safety regulations.

December 29, 1937. 3 M. C. C. 665. *Ex parte No. MC-2* established maximum hours of service for drivers of interstate, common or contract carriers by motor vehicles, Part V of such regulations.

July 9, 1938. 8 M. C. C. 162. *Ex parte No. MC-4* modified Part III of such regulations as to safety glass.

July 12, 1938. 6 M. C. C. 557. *Ex parte No. MC-2,* in the light of current experience, modified Part V of the regulations as to maximum hours of service for such drivers.

December 3, 1938. 10 M. C. C. 533. *Ex parte No. MC-4* adapted the Commission's general qualifications and regulations to those types of carriers which were ex-

---

mission because of their activities affecting the safety of motor carrier transportation. 28 M. C. C. 125.

*Ex parte No. MC-3,* Orders of July 30, 1936, December 23, 1936, and July 12, 1938. This related to *qualifications, maximum hours of service* of employees, safety of operation and equipment of *private carriers of property* by motor vehicle. 23 M. C. C. 1, and see 1 M. C. C. 1, 16.

*Ex parte No. MC-4,* Order of August 21, 1936. This related to *qualifications* of employees, safety of operation and equipment of common and contract motor carriers. It dealt especially with *drivers.* 1 M. C. C. 1.

*Ex parte No. MC-28,* Order of November 2, 1938. This related to the jurisdiction of the Commission over the establishment of *qualifications and maximum hours of service* of employees of common, contract and private carriers of property by motor vehicle under § 204 (a). The decision limited such jurisdiction to *employees affecting safety of operation* by motor vehicles. 13 M. C. C. 481.

The results of these proceedings are summarized in the text of this opinion in the order in which such results have been announced.

empted from the Motor Carrier Act by § 203 (b), but which had remained subject to the jurisdiction of the Commission, under § 204, as to qualifications and maximum hours of service of employees, safety of operation and equipment.

January 27, 1939. 11 M. C. C. 203. *Ex parte No. MC-2* further modified Part V of regulations as to maximum hours of service of drivers for common and contract carriers by motor vehicle.

May 9, 1939. 13 M. C. C. 481. *Ex parte No. MC-28* interpreted § 204 (a) as giving the Commission authority to prescribe qualifications and maximum hours of service of employees of common, contract and private carriers of property by motor vehicle only as to those employees whose activities affected safety of operation. It said:

> "Our experience and the study we necessarily made in connection with the administration of the Motor Carrier Act qualify us to prescribe such regulations [i. e., as to drivers], to promote safety of operation. Quite the contrary would be true if we were called upon to prescribe general qualifications for all employees of such carriers." *Id.* at 485.

Clerks, salesmen and executives were named as not being within the Commission's jurisdiction. Referring further to its power to prescribe qualifications and maximum hours of service with respect to drivers and others, the Commission said:

> "That power undoubtedly extends to drivers of such vehicles. It may well be that the activities of some employees other than drivers likewise affect the safety of operation of motor vehicles engaged in interstate and foreign commerce. If common and contract carriers, or private carriers of property, or their employees believe that the activities of employees other than drivers affect the safety of operation of motor

vehicles engaged in interstate and foreign commerce, they may file an appropriate petition, asking that a hearing be held and the question determined." *Id.* at 488.

May 27, 1939. 14 M. C. C. 669. *Ex parte No. MC-4.* The "Motor Carrier Safety Regulations, Revised," were found to be "reasonable requirements with respect to qualifications of employees and safety of operation and equipment of common carriers and contract carriers subject to the Motor Carrier Act, 1935, and that said revised regulations should be approved, adopted, and prescribed." *Id.* at 683.  These revisions strengthened the provisions as to qualifications of drivers, for common and contract carriers, as to eyesight, physical condition, age, and ability to read and speak English.  They extended the maximum hours of service regulations to drivers for the "exempt carriers" enumerated in § 203 (b), excepting only those referred to in subparagraph (4a) relating to farmers.[14]

June 15, 1939.  16 M. C. C. 497.  *No. MC-C-139.* Upon petition of American Trucking Associations, Incorporated, et al., the Commission reaffirmed its decision of May 9, 1939, in *Ex parte No. MC-28,* and stated the negative side of the proposition there established.  It said that § 204 (a) "does not empower us to prescribe maximum hours of service for employees of motor carriers whose activities do not affect the safety of operation." *Id.* at 497.

May 1, 1940.  23 M. C. C. 1.  *Ex parte No. MC-3.* Following extended hearings, the Commission made findings that are important here.  First, it found, as required by § 204 (a) (3), that "there is need for Federal regulation of private carriers of property to promote safety of operation of motor vehicles used by such carriers in the transportation of property in interstate or foreign com-

[14] See note 9, *supra.*

merce." *Id.* at 42. With comparatively few exceptions, such as those relating to farm trucks and industry trucks, the Commission then applied to drivers for private carriers of property by motor vehicle in interstate and foreign commerce the same qualifications, maximum hours of service and regulations as to safety of operation and equipment that it previously had prescribed, by its orders in *Ex parte No. MC–2, supra,* and *Ex parte No. MC–4, supra,* for drivers of common and contract carriers. *Id.* at 22, 42.

The significance of this action in relation to the present case is that, in considering the classes of work done by drivers for private motor carriers, the Commission found many instances where only a part of the driver's activities related to driving or to other operations affecting safety of transportation. For example, the Commission dealt with drivers of farm trucks. Section 203 (b) (4a) of the Motor Carrier Act exempts farm trucks, for most purposes, from the provisions of that Act. Nevertheless, § 204 retains them within the jurisdiction of the Commission with respect to the qualifications and maximum hours of service of employees whose activities affect the safety of operation of interstate carriers by motor vehicle. The Commission recognized that such drivers have many duties unrelated to those of driving or safety of operation; that farm trucks, to a large extent, do not travel public highways; that the work is not a year-round operation but generally is confined to the harvest season; but that, nevertheless, whenever such a truck is being operated in interstate transportation on the public highway, the hazards involved in such operation are comparable to those faced by drivers who devote their entire time to interstate truck driving of all kinds. With appropriate modifications, the Commission thereupon prescribed for drivers of farm trucks qualifications and maximum hours of service different from, but comparable to, those it had prescribed for

drivers of common and contract carrier trucks in general. Instead of its standard minimum requirement of 21 years of age, it set the minimum age requirement for drivers of farm trucks at 18, when the gross weight of the vehicle and load combined did not exceed 10,000 pounds. It declined to approve a minimum age of 16, although that had been accepted by some states. It eliminated the usual physical examinations. It relaxed its rule against transportation of passengers. It eliminated its requirement of keeping a driver's log showing a written record of the trips and stops made by each driver. It retained, however, its restriction against driving more than 10 hours in any one day and, in place of the prohibition against a total of more than 60 hours on duty in a week, it limited the total hours of driving, as distinguished from other duties, to 50 hours in a week. *Ex parte No. MC-3,* 23 M. C. C. 1, 27–28, 43.

The Commission took comparable action as to industry trucks. It recognized, for example, that a bakery driver-salesman devotes much of his effort and time to selling baked goods rather than to activities affecting the safety of operation of his truck. The Commission, however, did not relinquish jurisdiction over the qualifications of driver-salesmen nor did it refrain from regulating their driving time. It modified its usual rule by providing that, if a driver-salesman "spends more than 50 percent of his time in selling and less than 50 percent in performing such duties as driving, loading, and unloading," he may be permitted to exceed the usual limit of 60 hours on duty in any week of 168 consecutive hours, provided only that "his hours of driving are limited to a total of not more than 40 in any such week." *Id.* at 44, and see 31 (recommending 50 hours). This use by the Commission of a percentage of the driver's time as a basis for the adjustment of his permissible maximum hours of service is to be distinguished from the suggestion of the Administrator of the Wage and Hour Division, United States Department of Labor,

that the entire power of the Commission over safety regulations must be denied as a matter of law whenever, in any given week, an employee has devoted over 50% of his working time to activities not affecting safety, although he may have devoted the rest of his working time to driving a common carrier truck in interstate commerce.[15]   It is essential to the Commission's safety program whenever and wherever hazardous activities are engaged in that affect safety of operation of an interstate motor carrier, that those who engage in them shall be qualified to do so and that maximum hours of service affecting such safety of operation shall be established and enforced.  This means retaining and using, rather than relinquishing, the Commission's jurisdiction over partial-duty drivers and partial-duty loaders, a substantial part of whose activities affects the safety of interstate motor carrier operations, although the rest of their activities may not affect the safety of such operations.

Recognizing its potential jurisdiction over others than drivers, the Commission, in that proceeding, invited private carriers of property or their employees who "believe that the activities of employees other than drivers affect the safety of operation of motor vehicles engaged in interstate or foreign commerce" to institute proceedings in order that the question be determined.   *Id.* at 44.

March 4, 1941.   28 M. C. C. 125, *Ex parte Nos. MC–2* and *MC–3.*   In the light of the foregoing experience and hearings, together with the decision of this Court in *United States* v. *Amer. Trucking Assns., supra,* the Commission, in this latest and most informative decision, found that the classes of activities which it defined as those of mechanics, loaders and helpers affect the safety of operation of motor vehicles and that, therefore, employees engaging in such

---

[15] See Interpretative Bulletin No. 9, Wage and Hour Division, Office of the Administrator, par. 4 (b), November, 1943, 1944–1945 WH Man. 520, 523; discussed at note 24, *infra.*

classes of activities are subject to the Commission's power to prescribe their qualifications and maximum hours of service, pursuant to § 204 (a).[16] As related to loaders, the Commission announced the following findings of fact which are significant in the present case:

> *"Findings of fact.—* . . .
>
> "2. That loaders, as above defined,[17] employed by common and contract carriers and private carriers of property by motor vehicle subject to part II of the Interstate Commerce Act devote a large part of their time to activities which directly affect the safety of operation of motor vehicles in interstate or foreign commerce.
>
> .   .   .   .   .
>
> "4. That no employees of common and contract carriers or private carriers of property by motor vehicle, subject to part II of the Interstate Commerce Act, other than drivers and those classes of employees covered by the three preceding findings of fact [mechanics, loaders and helpers], perform duties which directly affect safety of operation." *Ex parte No. MC–2,* 28 M. C. C. 125, 138–139.

These findings of fact are squarely within the jurisdiction of the Commission. They state affirmatively that, in the opinion of the Commission, the activities of loaders as described by the Commission do affect the safety of operation of motor vehicles in interstate or foreign commerce. They include also a finding that such loaders "devote a large part of their time to activities which directly affect the safety of operation of motor vehicles in interstate or foreign commerce." In the absence of any discussion or classification, on a time basis, of the several

---

[16] See note 2, *supra,* for the Commission's definition of the work of loaders.

[17] *Ibid.*

activities of loaders described by the Commission, this additional finding amounts to another way of saying that a large part of the loader's activities affect such safety of operation. There is nothing to indicate that it uses the element of time other than as representative of the continuing work period during all of which the loader is devoting himself to the activities of his job as a loader. It amounts, therefore, merely to a finding as to the character of a large part of the activities of loaders, in accordance with the main purpose of the Commission's proceeding which was to determine to what extent, if any, the activities of loaders affect safety of operation.

This additional finding, however, is material from another point of view. It recognizes tacitly that even a full-duty loader may engage in some activities which do not affect safety of operation. Such "non-safety" activities may make up another "large part" of the loader's total activities. They may constitute an even larger part of his activities than his safety-affecting activities. In the present case it was shown by the courts below that, in addition to his activities in clerical checking, etc., a "substantial part" of the petitioner's activities consisted of the very kind of activities of a loader which the Commission has described as directly affecting safety of operation. If it be suggested that significance should be attached to the Commission's use of the word "large" rather than the lower courts' use of the word "substantial" in this connection, such significance disappears completely when it is seen that the Commission itself substitutes the word "substantial" for the word "large" in its conclusion of law which is quoted below.

While the indefiniteness of the terms "large" or "substantial" is obvious, nevertheless, those are the words which the Commission has chosen to use in dealing with this subject. Arbitrary or sharp lines of distinction do

not lend themselves readily to supplying that extra margin of security which is natural in safety engineering. The fundamental test is simply that the employee's activities affect safety of operation. This is the test prescribed by this Court in *United States* v. *Amer. Trucking Assns., supra.* The verb "affect" is itself incapable of exact measurement. Furthermore, we are dealing here not with the final application of the power of the Commission, but rather with the limits of its discretionary power to establish the qualifications and maximum hours of service when and where deemed by it to be needed. In issuing its regulations, the Commission itself can supply whatever definiteness the occasion shall require. From the point of view of the safety program under the Motor Carrier Act, there is no need for a sharply drawn limit to the power of the Commission to make regulations with respect to employees whose activities affect the safety of operation of motor vehicles in interstate or foreign commerce.

Turning to the conclusions of law which were reached by the Commission in the same proceeding we find the following:

> "*Conclusions of law.*— . . .

> "2. That our jurisdiction to prescribe qualifications and maximum hours of service for employees of common and contract carriers and private carriers of property by motor vehicle is limited to those employees who devote a substantial part of their time to activities which directly affect the safety of operation of motor vehicles in the transportation of passengers or property in interstate or foreign commerce.

> "3. That we have power, under section 204 (a) of said part II, to establish qualifications and maximum hours of service for the classes of employees covered by findings of fact numbered 1, 2, and 3 above

[mechanics, loaders and helpers], and that we have no such power over any other classes of employees, except drivers.

"A further hearing will be held to determine what regulations, if any, should be prescribed for those employees, other than drivers, whom we have found subject to our jurisdiction. No order is necessary at this time." *Ex parte No. MC–2,* 28 M. C. C. 125, 139.

As conclusions of law, these do not have the same claim to finality as do the findings of fact made by the Commission. However, in the light of the Commission's long record of practical experience with this subject and its responsibility for the administration and enforcement of this law, these conclusions are entitled to special consideration. Conclusion of law No. 2 must be read in close connection with finding of fact No. 2 and conclusion of law No. 3. It is apparent that, in conclusion of law No. 2, the phrase "employees who devote a substantial part of their time to activities which directly affect the safety of operation of motor vehicles" is intended to match the corresponding phrase in finding of fact No. 2 as to loaders who "devote a large part of their time to activities which directly affect the safety of operation of motor vehicles." This is made still more clear by conclusion of law No. 3 which finds that the Commission has jurisdiction to establish qualifications and maximum hours of service for the loaders included in both paragraphs. Here again there is no classification of the respective activities of loaders on the basis of the time devoted to each activity. The phrase closely follows a discussion of full-duty loaders and its reference to a "substantial part of their time" is but another way of saying a "substantial part of their activities as loaders."

Addressing ourselves to the questions of law presented by the case before us, we reaffirm our position in *United*

*States* v. *Amer. Trucking Assns.*, 310 U. S. 534, and *Southland Co.* v. *Bayley*, 319 U. S. 44. We recognize the Interstate Commerce Commission as the agency charged with the administration and enforcement of the Motor Carrier Act and especially charged with the establishment of qualifications and maximum hours of service of employees of common and contract carriers and private carriers of property by motor vehicle in interstate and foreign commerce. We see no reason to question its considered conclusion that the activities of full-duty drivers, mechanics, loaders and helpers, as defined by it, affect safety of operation of the carriers by whom they are employed. In harmony with our reasoning in *Southland Co.* v. *Bayley, supra,* and with that of the Interstate Commerce Commission in *Ex parte No. MC–3,* 23 M. C. C. 1, as to employees of private carriers, and in *Ex parte Nos. MC–2* and *MC–3,* 28 M. C. C. 125, as to mechanics, loaders and helpers in general, we hold that the Commission has the power to establish qualifications and maximum hours of service under § 204 (a) with respect to full-duty employees engaged in doing the work of loaders, although the Commission has not exercised that power affirmatively by establishing qualifications and maximum hours of service with respect to loaders.

In harmony with our decision in *United States* v. *Amer. Trucking Assns., supra,* and of the Interstate Commerce Commission in *Ex parte No. MC–28,* 13 M. C. C. 481, we recognize that the Commission has such power over all employees of such carriers whose activities affect safety of operation and that the Commission does not have such power over employees whose activities do not affect safety of operation. In the *American Trucking Associations* case it was not determined that it was necessary for any employee to devote all, or any precise share, of his working time or of his activities, to a particular class of work in

order for such class of work to be held to affect safety of operation. It was assumed, for the purposes of that case, that the employee devoted his entire working time and activities to the single class of work under consideration.

It has been noted, however, that the Commission, in defining the class of work, as a whole, of loaders, recognized, in its findings of fact, that that class of work in its nature included duties other than those directly affecting safety of operation. It said: "We conclude that loaders devote a large part of their time to activities which directly affect the safety of operation of motor vehicles operated in interstate or foreign commerce, and hence that we have power to establish qualifications and maximum hours of service for such employees under said section 204 (a)." *Ex parte No. MC-2*, 28 M. C. C. 125, 134, and see 139. This means that the nature of the duties of even a full-duty "loader" is such that it is not essential that more than a "large part" of his time or activities be consumed in activities directly affecting the safety of operation of motor vehicles—for example—loading, distributing and making secure heavy or light parcels of freight on board a truck so as to contribute as much as possible to the safety of the trip. On the other hand, it means also that more than half of the time or activities of a full-duty "loader" may be consumed in activities not directly affecting the safety of operation of motor vehicles—for example—in placing freight in convenient places in the terminal, checking bills of lading, etc. From the point of view of the Commission and its jurisdiction over safety of operation, this indicates that it is not a question of fundamental concern whether or not it is the larger or the smaller fraction of the employee's time or activities that is devoted to safety work. It is the character of the activities rather than the proportion of either the employee's time or of his activities that determines the actual need

for the Commission's power to establish reasonable requirements with respect to qualifications, maximum hours of service, safety of operation and equipment. This line of reasoning is consistent with that applied throughout this case. It results in keeping within the jurisdiction of the Commission's safety program partial-duty loaders, as well as full-duty loaders, provided only that the class of work done by them affects safety of operation, regardless of whether or not in any particular week they may have devoted more hours and days to activities not affecting safety of operation than they may have devoted to those affecting such safety of operation. The Commission uses similar language in asserting its jurisdiction over mechanics and helpers. This reasoning also resembles that by which the Commission imposes upon a "driver" a maximum total of 60 hours of service "on duty" of any kind, in a "week" of 168 consecutive hours, as well as a maximum of 10 hours, in the aggregate, of driving or operating of a motor vehicle in any period of 24 consecutive hours. *Ex parte No. MC–2,* 3 M. C. C. 665, 6 M. C. C. 557, 11 M. C. C. 203. For example, the Commission has recognized expressly that, in charter operations, the driver of a chartered bus may be on duty for long hours, but often may spend as little as one-half of that time actually driving. *Ex parte No. MC–2,* 3 M. C. C. 665, 679. All of these conclusions recognize that an employee who is engaged in a class of work that affects safety of operation is not necessarily engaged during every hour or every day in activities that directly affect safety of operation. While the work of a full-duty driver may affect safety of operation during only that part of the time while he is driving, yet, as a practical matter, it is essential to establish reasonable requirements with respect to his qualifications and activities at all times in order that the safety of operation of his truck may be protected during those

particular hours or days when, in the course of his duties as its driver, he does the particular acts that directly affect the safety of its operation.[18]

We have set forth the Commission's record of supervision over this field of safety of operation to demonstrate not only the extent to which the Commission serves Congress in safeguarding the public with respect to qualifications, maximum hours of service, safety of operation and equipment of interstate motor carriers, but to demonstrate the high degree of its competence in this specialized field which justifies reliance upon its findings, conclusions and recommendations.

Before examining further the new issue presented by the facts of this case, it is important to recognize that, by virtue of the unique provisions of § 13 (b) (1) of the Fair Labor Standards Act, we are *not* dealing with an exception to that Act which is to be measured by regulations which Congress has authorized to be made by the Administrator of the Wage and Hour Division, United States Department of Labor.[19]   Instead, we are dealing here with the

---

[18] See *Richardson* v. *James Gibbons Co.,* 132 F. 2d 627, argued and affirmed with *Southland Co.* v. *Bayley,* 319 U. S. 44.   In that case the Commission's power, under § 204 (a) (3), was upheld as to an employee who testified that he was employed "twenty-five per cent of the time as a truck driver and seventy-five per cent of the time as a distributor-operator" of liquid asphalt, and whose employer testified that the same employee "was employed approximately thirty per cent of the time in distributing the asphalt and seventy per cent in transporting same." *Id.* at 628.   Apparently his work was accepted as affecting safety of operation although only 25 to 70% of his time was spent as a driver and the balance of his time was spent in work not affecting safety of operation.

[19] Section 13 (b) (1), in this particular, is in sharp contrast with § 13 (a) (1) which provides as follows for the definition and delimitation of that exemption by the Administrator:

"SEC. 13. (a) The provisions of sections 6 and 7 shall not apply with respect to (1) any employee employed in a bona fide executive,

interpretation of the scope of the safety program of the Interstate Commerce Commission, under § 204 of the Motor Carrier Act, which in turn is to be interpreted in the light of the regulations made by the Interstate Commerce Commission pursuant to that Act. Congress, in the Fair Labor Standards Act, does not attempt to impinge upon the scope of the Interstate Commerce Commission safety program. It accepts that program as expressive of a pre-existing congressionally approved project. Section 13 (b) (1) of the Fair Labor Standards Act thus requires that we interpret the scope of § 204 of the Motor Carrier Act in accordance with the purposes of the Motor Carrier Act and the regulations issued pursuant to it. It is only to the extent that the Interstate Commerce Commission does *not* have power to establish qualifications and maximum hours of service pursuant to said § 204, that the subsequent Fair Labor Standards Act has been made applicable or its Administrator has been given congressional authority to act. This interpretation puts safety first, as did Congress. It limits the Administrator's authority to those "employees of motor carriers whose activities do not affect the safety of operation." *No. MC–C–139,* 16 M. C. C. 497.

Accordingly, we should approach the issue of the partial-duty driver and the partial-duty loader squarely from the point of view of the safety program of the Interstate Commerce Commission, as developed under § 204 of the Motor Carrier Act, apart from the Fair Labor Standards Act. The principle to be applied is the same in the case of the loader as in that of the driver, although the issue is more

administrative, professional, or local retailing capacity, or in the capacity of outside salesman (as such terms are defined and delimited by regulations of the Administrator); . . . ." 52 Stat. 1067, 29 U. S. C. § 213 (a) (1). See also, §§ 213 (a) (7), 213 (a) (10) and 214.

obvious when the test of jurisdiction is applied to the driver than when applied to any other class of employees of the motor carrier. This is because the driver's work more obviously and dramatically affects the safety of operation of the carrier during every moment that he is driving than does the work of the loader who loaded the freight which the driver is transporting. Furthermore, in the case of the driver, the Commission not only has found that it has the power to establish, but it actually has established, tested and revised, a set of qualifications for his service and a maximum limitation on the aggregate number of hours during which he safely may be permitted to drive during any period of 24 consecutive hours. It also has established a maximum limitation on the number of hours during any "week" of 168 consecutive hours during which such a driver safely may be permitted to be "on duty," even though many of his activities and much of his time while "on duty" may not affect safety of operation of the carrier.[20]

In the present case, the issue is whether the Commission has the power to establish qualifications and maximum hours of service with respect to partial-duty loaders comparable to the petitioner. It is not necessary, as a condition precedent, to find that the Commission has exercised, or should exercise, such power by actually establishing qualifications and maximum hours of service with respect to loaders in general, corresponding to those established for drivers in general. The existence of the power is enough. The fact that the Commission has found it necessary to establish qualifications and maximum hours of service which cover not only drivers, but also partial-

---

[20] Safety Regulations for Carriers by Motor Vehicle, 49 CFR, Cum. Supp., Part 190—General Definitions; Part 191—Hours of Service; Part 192—Qualifications of Drivers; Part 193—Driving of Motor Vehicles; Part 194—Necessary Parts and Accessories; Part 195—Accident Reports; Part 196—Inspection and Maintenance.

duty drivers, is an indication that, in the opinion of the Commission, its power, under the Motor Carrier Act, extends to partial-duty as well as to full-duty employees engaged in activities affecting the safety of operation of interstate motor carriers.

The principle can be tested by the use of a partial-duty driver as an example. His activities are such that the exclusion of them from the Commission's safety program would have serious consequences. In the case of the full-duty driver, there is no question as to the power of the Commission to establish reasonable requirements with respect to his qualifications and hours of service.[21] Regulations on these subjects were in effect throughout the period with which this case is concerned. In the class of work referred to by the Commission as that of driver-salesmen of industry trucks, the regulations which have been issued have been mentioned above.[22] These were adapted expressly to drivers who devoted less than 50% of their time to driving. The effect thus given by the Commission to the fact that such employees devote less than one-half of their time to driving is not to exclude such partial-duty drivers from any of its required qualifications. These qualifications include those relating to eyesight, physical condition, age, or ability to read or speak English, etc., which are deemed by it to be important for drivers in general. On the other hand, this fact that cer-

---

[21] See 49 CFR, Cum. Supp., Parts 191 and 192.

[22] Discussed at pages 667–668, *supra*. *Ex parte No. MC-3*, 23 M. C. C. 1, 31, 44.

". . . no driver salesman employed by a private carrier of property who devotes more than 50 percent of his time to selling and less than 50 percent to such work as driving, loading, unloading, and the like, shall be permitted or required to drive or operate a motor vehicle for more than an aggregate of 50 hours in any week as defined in said § 191.1 (e)." (Such a "week" is defined as "any period of 168 consecutive hours beginning at the time the driver reports for duty, . . . .") 49 CFR, Cum. Supp., § 191.3 (b).

tain employees devote a part, rather than all, of their time to driving has brought forth from the Commission an appropriate modification of its safety regulations to fit that fact. The modification takes the form of eliminating the Commission's limitation on the total maximum hours that the employee can remain on duty in a week of 168 consecutive hours but limiting his hours of actual driving to an aggregate of not more than 50 in any such week. This requirement, established by the agency which is recognized by Congress as the one body authorized to establish qualifications and maximum hours of service applicable to drivers of motor carriers in interstate commerce, is a demonstration that such agency has found it necessary to make active use of its powers of regulation in this field of part-time driving. It follows, as a matter of principle, that, if such power exists with respect to full-duty drivers and partial-duty drivers because they affect the safety of operation of the interstate motor carriers, the power exists also with respect to full-duty loaders and partial-duty loaders because they too affect such safety of operation, although not in precisely the same manner.

From a safety standpoint, a partial-duty driver who drives 30 hours continuously and then drives no more during that week creates a greater hazard than the man who drives 10 hours daily for 6 days a week. The hazard of continuous driving is not measured adequately by the total hours during which the driver is employed during the week, nor is it eliminated by a law which entitles him merely to an increased rate of pay for whatever time, above 40 hours per week, he shall work in any one workweek. The loading of any truck load of mixed freight requires that the general qualifications of the loader be adequate, regardless of the proportion of his working time that may have been devoted to this activity or to other activities in that particular week. Similarly, his hours of continuous work

during a day of heavy loading may render him unfit for loading the last truck on that day even though, for the entire balance of that week, he may engage in no activities whatever or may engage in only such activities as are unrelated to safety of operation.

We have in this case an employee working full time throughout his employment as a "checker" or "terminal foreman." If he had worked full time as a "loader" as defined by the Commission, he would have been unquestionably within the jurisdiction of the Commission to the extent necessary to exclude him from § 7 of the Fair Labor Standards Act. Under the conclusions of law of the Commission in *Ex parte No. MC–2*, 28 M. C. C. 125, 139, a full-duty "loader" does not have to devote more than a "substantial part" of his time to activities directly affecting safety of operation in order to be subject to the power of the Commission to establish qualifications and maximum hours of service with respect to him. So here it is enough for the purposes of this case that a substantial part of the petitioner's activities consisted of the doing or immediate direction of the very kind of activities of a loader that are described by the Commission as directly affecting safety of operation. The petitioner's activities thus affected safety of operation, although it does not appear what fraction of his time was spent in activities affecting safety of operation. As a consequence, he comes within the power of the Commission to establish qualifications and maximum hours of service with respect to him and, by the express terms of § 13 (b) (1) of the Fair Labor Standards Act, he is excluded, automatically, from the benefits of § 7 of that Act.

Recognizing that it is the intent of the Fair Labor Standards Act to give full recognition to the safety program of the Motor Carrier Act, this conclusion does not conflict with the meaning or purpose of the Fair Labor Standards

Act, although it does reduce the scope of application of the compulsory overtime compensation provisions of § 7 of that Act.

The contrary position which has been taken as to partial-duty drivers, mechanics, loaders and helpers by the Administrator of the Wage and Hour Division, United States Department of Labor, requires mention. This position no doubt arose from a desire to give wide effect to the Fair Labor Standards Act in an effort to comply with its remedial character. Generally, an expansion of the jurisdiction of the Act does not conflict with jurisdictions established under other Acts of Congress, whereas here every expansion of the jurisdiction of the Act through interpretation of § 13 (b) (1) cuts down the jurisdiction of the Commission under § 204 of the Motor Carrier Act. Furthermore, in seeking a practical method of resolving other administrative difficulties such as that of determining the degree of interstate activity or administrative service which should be the measure of the jurisdiction of the Act or of exemption from it, the Administrator has found it practical to fix upon a specific proportion of time devoted to a particular kind of activity and to make that proportion decisive. In some instances, in regulations, he has used 20% as a test of substantiality.[23]

In an attempt to resolve the present difficulty in a similar manner, the Administrator at one time proposed that, if an employee in any given week devoted 20% or more of his time to activities not affecting safety of operation, he would be entitled to the benefits of the overtime provisions of § 7 of the Fair Labor Standards Act.[24] He soon abandoned this, but he has attempted to answer

---

[23] 29 CFR, Cum. Supp., §§ 541.1 (f), 541.3 (a) (4), 541.4 (b), and 541.5 (b). See also, *Ralph Knight, Inc.* v. *Mantel*, 135 F. 2d 514.

[24] Interpretative Bulletin No. 9, Wage and Hour Division, Office of the Administrator, March, 1942, par. 5 (b), 1943 WH Man. 186, 189.

the question on a 50% basis in Interpretative Bulletin
No. 9, Wage and Hour Division, Office of the Adminis-
trator, November, 1943, 1944–1945 WH Man. 520, 523,
as follows:

"4. . . .

"(b) It should be noted that any truck driver, driv-
ers' helper, mechanic, or loader employed by a com-
mon, contract, or private carrier who spends the
greater part of his time during any workweek on non-
exempt activities (such as producing, processing, or
manufacturing goods, warehouse or clerical work, or
other type of work which does not affect safety of
operations) is not within the scope of the exemption
contained in Section 13 (b) (1). It is the opinion
of the Division that Congress did not intend that this
exemption should be available as a vehicle to exempt
employees who spend most of their time in work other
than that which forms the basis of the exemption."

In paragraph 2 of this Bulletin he recognizes the limited
legal effect to which this interpretation is entitled, espe-
cially insofar as it concerns the meaning of § 204 of the
Motor Carrier Act.[25]

Such an interpretation conflicts, however, with the
Commission's safety program. It conflicts directly, for
example, with the regulation of the Commission as to

---

[25] "2. The scope of the exemption provided in Section 13 (b) (1)
involves the interpretation not only of the Fair Labor Standards Act
but also of Section 204 of the Motor Carrier Act, 1935. The Act con-
fers no authority upon the Administrator to extend or restrict the
scope of the exemption provided in Section 13 (b) (1) or even to
impose legally binding interpretations as to its meaning. This bul-
letin is merely intended to indicate the course which the Administrator
will follow in the performance of his administrative duties until other-
wise required by the authoritative rulings of the courts. It is never-
theless to be noted that the Supreme Court has held that the interpre-
tations expressed in bulletins of this Division are entitled to great
weight."

partial-duty drivers of industry trucks of private carriers in interstate commerce.[26]

The fundamental and ever-recurring difficulty with the Administrator's interpretation of the scope of § 7 of the Fair Labor Standards Act is that to the extent that he expands the jurisdiction of the Fair Labor Standards Act he must reduce the jurisdiction of the Commission under the Motor Carrier Act, whereas he has no authority to do so.[27]

---

[26] See note 22, *supra.*

[27] In 1945, upon the recommendation of the Administrator of the Wage and Hour Division, United States Department of Labor, S. 1349 was introduced proposing many amendments to the Fair Labor Standards Act. That Bill, as introduced and as recommended for passage by the Senate Committee on Education and Labor, proposed expressly to expand somewhat the scope of the Fair Labor Standards Act without reducing the jurisdiction of the Commission under the Motor Carrier Act, by amending § 13 (b) (1) to read:

"Sec. 13. . . .

"(b) The provisions of section 7 shall not apply with respect to (1) any employee who during the greater part of any workweek is engaged in work with respect to which the Interstate Commerce Commission has established qualifications and maximum hours of service pursuant to the provisions of section 204 of the Motor Carrier Act, 1935; . . . ."

Hearings on S. 1349 before the Subcommittee of the Senate on Education and Labor. September 25, 1945, pp. 4, 249, *et seq.*; Sen. Rep. No. 1012, 79th Cong., 2d Sess., pp. 3, 11, 17; Part 2, pp. 5, 135.

This Amendment, however, was eliminated on the floor of the Senate, 92 Cong. Rec. 2656, 2657, 3094, 3095, 3096, 3185, before passage of the Bill, April 5, 1946. Furthermore, it was not included in the companion Bill, H. R. No. 4130, as reported to the House of Representatives by the Committee on Labor June 19, 1946, H. R. Rep. No. 2300, 79th Cong., 2d Sess., although it was recommended in the minority report of that Committee. *Id.* at 7, 15, 19. See also, Hearings before the Committee on Labor of the House of Representatives, 79th Cong., 1st Sess., pp. 864, 905. Congress adjourned without taking final action on either Bill, but, when Congress adjourned, neither pending measure contained the proposal.

Our conclusion is that, under the Motor Carrier Act, the Interstate Commerce Commission has power to establish qualifications and maximum hours of service for those employees whose service affects the safety of transportation of common carriers, contract carriers or private carriers of property in interstate and foreign commerce; that such Commission has been charged with the administration and enforcement of that Act; and that in the course of performance of its duties and after extended hearings on the subject, it has found that the work of loaders, as defined by it, affects safety of motor carrier operation. Furthermore, we conclude, upon the findings of the lower courts in this case, that the petitioner was employed by a motor carrier of interstate freight within the meaning of the Motor Carrier Act and that, throughout the period at issue, a substantial part of his activities consisted of doing, or immediately directing, the work of one or more loaders as defined by the Interstate Commerce Commission and affecting the safety of operation of motor vehicles in interstate or foreign commerce; that, accordingly, the Commission, with respect to him, had power to establish qualifications and maximum hours of service; and that, by virtue of § 13 (b) (1) of the Fair Labor Standards Act, the provisions of § 7 of that Act as to overtime pay were rendered inapplicable to him. The judgment of the Supreme Court of Illinois therefore is

*Affirmed.*

Mr. Justice Rutledge, dissenting.

As the Court's opinion says, there is no necessary inconsistency between enforcing Interstate Commerce Commission regulations concerning "qualifications and maximum hours of service of employees" affecting safety, 49 Stat. 543, 546, and at the same time, within those limitations, requiring compliance with the Fair Labor Standards Act's provisions for overtime pay. Indeed the latter would

reinforce the former. Ordinarily, when statutes are not inherently conflicting, the rule applied in construing them is to give each as much room for operation as is consistent with its terms and purposes, rather than to create conflict unnecessarily between them.

Nothing in the Motor Carrier Act forbids or inhibits the operation of § 7 of the Fair Labor Standards Act. The latter statute, it has been held repeatedly, is to be broadly and liberally applied, in order to achieve its prime objects of distributing and raising standards of employment and living.[1] The Act however contains certain exempting provisions, which are to be narrowly construed in the light of and in order to accomplish the same statutory purposes.[2]

Among these is § 13 (b) (1). It reads: "The provisions of section 7 shall not apply with respect to (1) any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 204 of the Motor Carrier Act, 1935 . . . ." 52 Stat. 1060, 1068. It is the meaning and effect of § 13 (b) (1) which we have now to determine in relation to employees who do some work affecting safety in operations and some not affecting it.[3]

Read literally, in the light of the *Southland* decision,[4] the section would exempt all employees who do any work affecting safety operations, as the Illinois Court of Ap-

[1] *Tennessee Coal Co.* v. *Muscoda Local*, 321 U. S. 590, 597; *Phillips Co.* v. *Walling*, 324 U. S. 490, 493; *Calaf* v. *Gonzalez*, 127 F. 2d 934, 937.

[2] *Phillips Co.* v. *Walling, supra; Calaf* v. *Gonzalez, supra.*

[3] As to employees engaged full time in such work, *Southland Co.* v. *Bayley*, 319 U. S. 44, held that the existence of power in the Commission, whether or not exercised, to prescribe qualifications and hours of service, excludes them under § 13 (b) (1) from coverage under the Fair Labor Standards Act's terms. Cf. note 11.

[4] *Ibid.*

peals held in this case.[5]   For, factually speaking, not the
amount of time an employee spends in work affecting
safety, but what he may do in the time thus spent whether
it be large or small determines the effect on safety.   Ten
minutes of driving by an unqualified driver may do more
harm on the highway than a month or a year of constant
driving by a qualified one.

It would seem essential therefore to effective safety con-
trol by the Commission that it should have power to deter-
mine the qualifications and maximum hours of service of
all employees whose work substantially affects safety,
whether or not they spend what may be found to be less
than a "substantial" amount of time in that sort of work.
Anything less than this would open the door to the great-
est danger to motor traffic from casual, unqualified drivers
or other employees whose work affects safety.

There is or may be in some circumstances a relation
between time spent in such work and substantial effects
upon safety, but it is by no means an exclusive or control-
ling one.   Time affects the duration and scope, not neces-
sarily the existence, of the risk.

I accept the "safety first" view of the Commission's
power.   And this requires acceptance of the view that, in
relation to some kinds of work, the Commission has power
to prescribe the qualifications of all employees who engage
in it to any extent, though the time thus spent is not
five minutes daily or weekly.   "Substantial effect" in
these instances has little if any relation, negatively speak-

---

[5] The court said: ". . . We believe that the true determinant is
whether an employee performs *any* duties which substantially affect
the safety of operation, rather than whether the duties affecting safety
are substantial." 323 Ill. App. 505, 509. (Emphasis added.) This is
also the Commission's position taken in the brief and at the argument
in this cause. See note 16. The Illinois Supreme Court found the
test in "a substantial part of plaintiff's work." 389 Ill. 466, 473.

ing, to "substantial time." Driving and the work of mechanical repair of trucks are obvious examples. Loading may be another, less obviously as the Court says, but depending upon the circumstances under which it is done.[6] So with the work of helpers in these three functions.

Notwithstanding the Commission's contrary finding,[7] this means that all employees who do any part of certain kinds of work, for however short a time, regularly or casually, fall within the Commission's power. It means, for instance, that a person who spends ten minutes a day or an hour a week in driving or in mechanically repairing trucks, and the remaining 39 hours of a 40-hour week in work having no effect upon safety falls within the Commission's authority. For, in such circumstances, it cannot be held that the comparatively minute amount of time spent in work affecting safety is trivial or inconsequential in its possible effects upon safety. And in the Court's view, as I understand it, the result is not only that the Commission has power to prescribe the qualifications of all such employees,[8] but also that they are thereby ex-

---

[6] Thus, one who has the sole responsibility of loading or of directing loading, where weight of the articles carried is unequal and its distribution may affect safety, would seem clearly to be within the classification whether the time spent is large or small. On the other hand, if the worker is merely a helper, loading under direct and active supervision of another, with no responsibility other than to obey his superior's orders as to placement, it would seem clear that his work does not affect safety.

[7] See text *infra* at note 15; and note 16.

[8] The opinion puts the matter in various ways. *E. g.,* "The fundamental test is simply that the employee's activities affect safety of operation." "The term 'partial-duty loader' is used . . . so as to avoid the implication that time spent in certain activities, rather than the character of those activities, is to be the conclusive factor . . . ." Note 3. "It is essential to the Commission's safety program whenever and wherever hazardous activities are engaged in that affect

empted from the overtime pay provisions of the Fair Labor Standards Act.

It is from the latter conclusion that I dissent. I cannot believe that Congress, when it incorporated § 13 (b) (1) in the statute, intended to exclude from those provisions every employee who might spend ten minutes a day in work substantially affecting safety and seven hours and fifty minutes in work having no effect whatever upon it. An exactly literal application of § 13 (b) (1), it is true, would lead to this result. But we are frequently told that rigidly literal application of a statute may be ruinous to achieving its purposes.[9] It is especially so in this instance, in view of the nature and purposes of the Act we are construing, for a variety of reasons.

The legislative history shows, in my judgment, that Congress did not have in mind so expansive and destructive an exemption as literal application of § 13 (b) (1) and the Court's ruling [10] would produce. Congress clearly intended to exempt some employees who do not devote all their time to such work. But at the time it acted its pri-

---

safety . . . that those who engage in them shall be qualified . . . ." "We recognize that the Commission has such power over all employees . . . whose activities affect safety . . . ." "It is the character of the activities rather than the proportion of either the employee's time or of his activities that determines the actual need for the Commission's power . . . ." "The loading of any truck load of mixed freight requires that the general qualifications of the loader be adequate, regardless of the proportion of his working time that may have been devoted to this activity . . . ." "The petitioner's activities thus affected safety of operation, although it does not appear what fraction of his time was spent in activities affecting safety of operation."

[9] Cf. note 12. "All construction is the ascertainment of meaning. And literalness may strangle meaning." *Utah Junk Co.* v. *Porter*, 328 U. S. 39, 44; *Markham* v. *Cabell*, 326 U. S. 404, 409; *Church of the Holy Trinity* v. *United States*, 143 U. S. 457.

[10] See note 8 and text *infra* at note 15.

mary concern and that of the Commission [11] were with full-time employees, principally drivers, so engaged. In view of that fact, it cannot be taken that Congress intended every employee assigned for a few minutes daily or weekly to work substantially affecting safety to be eliminated from the overtime pay provisions. Such a view in practical effect would nullify the Act's broad and inclusive purposes for large numbers of employees as to whom, at the time, the Commission had shown no concern in exercising its safety power or in its representations to Congress, and as to whom therefore there was no sound reason for or purpose of exemption.

Moreover, acceptance of such a construction would set up an easy mode for evasion of the Fair Labor Standards Act's requirements. An employer so minded readily could assign to nonsafety employees whom he desired to remove from the overtime pay requirements work affecting safety for minute portions of their total service. Committing the Act's coverage in all such possible situations to a determination of the employer's good faith could only invite continuous litigation upon his motive, a result in itself tending strongly to defeat the rights given by the Act. I do not think Congress intended such consequences for the statute's effective operation when it included § 13 (b) (1).

The difficulty lies of course not only in the rigidly literal interpretation given to that section, but in the corol-

---

[11] The exemption made by § 13 (b) (1) was suggested to Congress originally by the Interstate Commerce Commission. *United States* v. *American Trucking Assns.,* 310 U. S. 534, 549. The legislative history shows that the section "was adopted to free operators of motor vehicles from the regulation by two agencies of the hours of *drivers,*" *Southland Gasoline Co.* v. *Bayley,* 319 U. S. 44, 48–49, upon the understanding that the Interstate Commerce Commission "had already acted upon maximum hours for drivers . . . ." *Id.,* at 49, n. 5. (Emphasis added.) See also note 16.

lary assumption of intended complete mutual exclusiveness of the Commission's power and the Fair Labor Standards Act's applicability drawn from it. As I do not think Congress intended the one, in relation to the problem now presented, so I do not believe it had the other in mind. And if this was true, then the problem for us becomes, as it most often does in such situations, one of making accommodation between the two statutes in a manner which will give to each its maximum effect without nullifying Congress' manifest intention.[12]

If the spirit and purposes of the statutes are taken into account, we are not inescapably compelled to choose between the equally untenable alternatives of a completely literal application of § 13 (b) (1) and a construction which would nullify the Commission's power concerning the great bulk of employees to which it rightfully extends. Although the exemption of § 13 (b) (1) is not among those which specifically empower the Administrator to determine their scope by regulations,[13] he is charged with the duty of administering it and his experience is entitled to weight when he formulates conclusions from it for the purpose of applying the Act's provisions, albeit they are not conclusive. The present problem has not been without difficulty for the Administrator,[14] but his final ruling,

---

[12] "The problem of statutory construction . . . should not be solved simply by a literal reading of the exemption section of the Fair Labor Standards Act and the delegation of power section of the Motor Carrier Act. Both sections are parts of important general statutes and their particular language should be construed in the light of the purposes which led to the enactment of the entire legislation." *Southland Gasoline Co.* v. *Bayley,* 319 U. S. 44, 47.

[13] See §§ 13 (a) (1), 13 (a) (7), 13 (a) (10), 14.

[14] The Administrator originally interpreted the exemption to be inapplicable to any employee who spent a substantial amount of his time in nonexempt work. Subsequently "substantial" was explained to mean more than twenty per cent of the employee's time. Interpre-

resulting from his experience, presents in my opinion both the most workable solution and the one most consistent with Congress' purpose and intent relating to the operation of both Acts. It is that the exemption is inapplicable to any employee "who spends the greater part of his time during any workweek on non-exempt activities (such as producing, processing, or manufacturing goods, warehouse or clerical work, or other type of work which does not affect safety of operations)."

Such a standard is more consistent with the Act's purposes than the one applied by the Court, not only in the light of the legislative history, but also in that it is more definite, more easily applied, and not invitingly conducive to litigation. For these reasons, and because I do not believe a totally literal application of § 13 (b) (1) was comprehended for the situations now presented, I think a line so drawn most nearly consistent with what Congress had in mind to accomplish by the exemption.

However, since there is no essential inconsistency in the two statutes or their operation, I do not think it necessarily follows that part-time employees thus not excluded from the Fair Labor Standards Act's coverage are thereby excluded from the Commission's safety power. That power I would leave unqualified as to them, since nothing in either statute compels qualification, as to employees not exempted, of the authority given the Commission to regulate "qualifications and hours of service of employees" whose work affects safety. The two statutes clearly are mutually exclusive, though not essentially inconsistent, as to employees primarily engaged in operations affecting

tative Bulletin, No. 9, March, 1942, Wage & Hour Manual (1943 ed.) 186, 189. Later the ruling was changed so that the exemption was given its present form as stated in the text, *infra*. Interpretative Bulletin No. 9, November, 1943, Wage & Hour Manual (1944–1945 ed.) 520, 523.

safety. They are not necessarily or, I think, by virtue of Congress' intent or command, thus exclusive as to others.

I therefore agree that "substantial effect" upon safety rather than "substantial time" spent in doing work affecting it determines the scope of the Interstate Commerce Commission's safety power. However, in accepting this conclusion, though not the further one that all employees so covered are within the exemption of § 13 (b) (1), I do so not upon the basis of the Commission's own determination, which expressly adopts the criterion of "substantial time" and is therefore both narrower than and inconsistent with the Court's ruling as to the extent of its power.[15] The Commission's determination tends strongly to support the Administrator's position as to the scope of the exemption intended to be created by § 13 (b) (1). But its voice is only persuasive, not conclusive, upon the question of the scope of its power. In adopting "substantial time" rather than "substantial effect," I agree that the Commission has

[15] The Court purports to adopt the Commission's basis for determining what employees are within the safety power, especially as made in *Ex parte Nos. MC–2* and *MC–3*, 28 M. C. C. 125. But since the test the Court now prescribes is apparently one of "substantial effect" rather than "substantial time," see note 8, it differs from the basis of the Commission's ruling. The Commission's findings of fact and conclusions of law are set forth in the text of the majority opinion. The quoted finding is that loaders "devote *a large part of their time* to activities which directly affect the safety of operation." 28 M. C. C. at 139. And the conclusion of law is stated in terms of time, namely, "that our jurisdiction . . . *is limited to* those employees who devote *a substantial part of their time* to activities which directly affect the safety of operation," and "that we have power . . . to establish qualifications . . . for the classes of employees" covered by the findings of fact, and "that *we have no such power over any other classes of employees,* except drivers." *Ibid.* (Emphasis added.) This necessarily excluded employees of the classes covered not devoting a substantial part of their time to work affecting safety, in view of the findings.

ruled too narrowly. Indeed, its brief in this case maintains as much.[16] Accordingly I conclude, independently of its formal determination, that the full and adequate performance by the Commission of the safety function conferred by the Motor Carrier Act requires the larger scope which the Court's ruling allows for its operation.

The views expressed in this opinion, of course, would apply also in *Pyramid Motor Freight Corp.* v. *Ispass,* 330 U. S. 695, decided this day, but in view of the decision in this case it is not necessary to file a separate dissent in the companion one.

MR. JUSTICE BLACK and MR. JUSTICE MURPHY join in this dissent.

---

[16] The difference in the Commission's findings and conclusions, as made in *Ex parte Nos. MC-2* and *MC-3,* see note 15, and the position taken here by counsel in its behalf was the occasion for some difficulty, if not embarrassment, at the argument. The brief and argument, by contrast with the findings and conclusions, maintained: ". . . it seems clear that, regardless of the amount of time devoted to the work by an individual loader (or loader foreman), he is expected to be fitted, and in fit condition, to perform it when the occasion arises and therefore intended to be subject to the Commission's authority over qualifications and hours of service." Reliance was placed squarely upon the position taken in this case by the Illinois Court of Appeals. See note 5.

Able counsel for the Commission sought to avoid the effect of the findings and conclusions by restricting it to classes of employees without reference to individual employees. It was not satisfactorily explained, however, how an individual employee could be brought within the class without being brought within the outer boundary prescribed by the Commission for defining the class.