**ISPASS et al. v. PYRAMID MOTOR FREIGHT CORPORATION.**

Civ. 20–145.

District Court, S. D. New York.

April 13, 1948.

Leon Spielvogel, of New York City (Ramey & McKelvey and Deane Ramey, both of New York City, of counsel), for plaintiffs.

Kaye, Scholer, Fierman & Hays, of New York City (Milton Kunen and Jack L. Ratzkin, both of New York City, of counsel), for defendant.

CONGER, District Judge.

This is an action on remand from the Supreme Court of the United States.[1]

In the original trial of the suit upon an agreed statement of facts, the District Judge dismissed the complaint "without prejudice"[2] after plaintiffs' refusal to seek determination by the Interstate Commerce Commission of their status under Section 13(b) (1) of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., and the Motor Carrier Act, 49 U.S.C.A. § 1 et seq., the Judge having declined to decide such question. 54 F.Supp. 565. The Circuit Court of Appeals for this Circuit affirmed the judgment of dismissal as to plaintiff Shapiro but reversed with respect to the other

---

[1] Pyramid Motor Freight Corp. v. Ispass et al., 330 U.S. 695, 67 S.Ct. 954, 91 L.Ed. 1184.

[2] 59 F.Supp. 341.

plaintiffs and remanded the case for entry of judgment in their favor. 152 F.2d 619. No objection was made in the Supreme Court as to the disposition of Shapiro's case, and so the following discussion does not concern him.

The plaintiffs, employees of defendant, brought suit under Section 16(b) of the Fair Labor Standards Act [3] to recover unpaid overtime compensation in accordance with the Act for various periods between 1938 and 1941. The defendant's answer alleged that it was an interstate common carrier of freight by motor vehicle and that the plaintiffs were employees with respect to whom the Interstate Commerce Commission had power to establish qualifications and maximum hours of service pursuant to the provision of Section 204(a) of the Motor Carrier Act [4], and that, therefore, plaintiffs were excluded from coverage under the Fair Labor Standards Act by virtue of Section 13(b) (1).[5]

The Supreme Court remanded the case for determination " * * * whether the activities of the respective respondents consisted, either wholly or in substantial part, of the class of work which is defined by the Interstate Commerce Commission in Ex parte No. MC–2, 28 M.C.C. 125, 133-134, as that of a 'loader,' and as affecting the safety of operation of motor vehicles in interstate or foreign commerce." 330 U.S. 695, 706, 67 S.Ct. 954, 960, 91 L.Ed. 1184. The true nature of plaintiffs' work was not ascertainable from the description contained in the agreed statement of facts from which I quote:

"Item 3: As to the northbound freight the loaded vehicles would come into New York in the very early morning hours to the West 11th Street Terminal where new drivers took charge of the vehicles, and what were called downtown helpers rode on the vehicles with the drivers to the 38th Street Terminal. At such terminal the doors of the trucks were opened in the mornings, both the driver and downtown helper remaining on the vehicles. As the downtown helper pushed the freight packages over the tailboards they were received by the plaintiffs, who then placed the freight packages in the sub-terminal building. Still later in the mornings the plaintiffs then delivered the packages to various consignees in the Garment Center, generally using for that purpose what are called hand-trucks or flat trucks, using their own manpower for propulsion.

"During those same days other northbound trucks after first stopping at the West 11th Street main terminal to change a driver and receive a downtown helper, bypassed the West 38th Street sub-terminal and parked first at one place and then alongside the curbs in the Garment Center. At those places the unloading operation was performed in the same way as at the sub-terminal hereinabove described, and the plaintiffs then made the deliveries by hand or by hand trucks into the insides of the Garment Center buildings.

"Item 4: In the late afternoons and early evenings freight originating with various consignors at various locations in the Garment Center was 'picked up' for intended delivery the next morning in Philadelphia or elsewhere south of New York. As to these southbound operations the fact were these: Some of the freight packages would be picked up by the plaintiffs at the consignor's places of business in the Garment Center and hand-trucked by them to the West 38th Street sub-terminal. At that place the plaintiffs themselves did, in due course, *physically load* the freight packages into a waiting truck which, when loaded, took up this journey first to the West 11th Street main terminal, and then with a new driver went on to the destinations south of New York. A downtown employee other than the plaintiffs would also at the same time so load the vehicles.

"Other trucks for southbound loadings took their stations on the public streets in the Garment Center where the plaintiffs brought the packages by hand or by hand truck. *The part which the plaintiffs took in such loading consisted of the lifting of the packages on to the tailboards of the trucks, and very often when the weights or size of the packages so required they would*

[3] 29 U.S.C.A. § 216 (b).
[4] 49 U.S.C.A. § 304 (a).
[5] 29 U.S.C.A. § 213 (b) (1).

*stand inside the truck bodies and, together with the downtown employee, stack and pile the freight in the vehicle."* [Italics added.]

I, therefore, permitted the parties to enlarge the record by testimony of the "loading" done by the plaintiffs in order to determine the question raised in the opinion of the Supreme Court. The defendant examined several witnesses on the point, and they all outlined the plaintiffs' general duties substantially in accordance with the stipulation of facts. However, they elaborated on the manner and extent of the plaintiffs' loading, and their testimony convinces me that the plaintiffs are not "loaders" within the meaning of the term as set forth in Ex parte No. MC-2, supra.

As the stipulation and the testimony indicate, the major part of the plaintiffs' time was consumed in delivering packages by hand trucks to various consignees in the Garment Center and in picking up packages from consignors for Philadelphia or other southbound delivery by their employer. It was solely in connection with these southbound deliveries that the plaintiffs expended effort in placing the packages in the truck. These operations took place either at the West 38th Street sub-terminal of the defendant or at various locations on the public streets of the Garment Center to which places the plaintiffs had brought the packages by hand trucks.

According to the testimony these trucks, of which there were three daily, on the average, but occasionally four, were manned by a driver and one to four driver's helpers. When the southbound truck arrived at location for loading, the plaintiffs would place the packages on the tailboard of the truck. What occurred after that is the immediate issue of the case.

It does not appear that the plaintiffs assisted, as a matter of course, in removing the packages from the tailboard and handling them inside the truck, nor does it appear that the plaintiffs, when occasion for this work arose, did any more than act under the direction of the driver or his helpers in stacking the packages in the truck. The defendant's witnesses support these conclusions.

Defendant's witness Sklar, who was in charge of the West 38th Street sub-terminal testified:

"Q. You spoke about a truck. What about that? What else did they have besides a hand truck? A. As I said, they would either bring it to me at the 38th Street terminal or if there was a truck nearer the pickup, they would deposit it on the truck, either throw it up on the truck if they could, or else wait until we had additional help, and they would lift it up to the tail-gate. Then they would help the driver or the man, whichever one of these helpers was on the truck, help him stack it and load it on whatever was required.

"The Court: They would put the packages on the tail-gate and then help the driver to stow it, is that right? The Witness: Stack it. That is right. * * * "

Defendant's witness Cohen, who was formerly in the employ of defendant, doing the same type of work as plaintiffs, testified that the plaintiffs loaded the truck every day.

One Abraham Micklin, who is presently employed as a driver by defendant, testified in its behalf in part as follows:

"Q. Now, then, tell the Court what happened after that. A. Then we proceeded to make pick-ups. These men would go around making pick-ups and bring them back to the truck and we would load it into the truck.

"Q. When you say 'we' whom do you have reference to? A. Whoever came along, that brought merchandise back to me.

"Q. Was that some of the plaintiffs I mentioned to you before? A. Yes.

"Q. How long did this loading take? A. Anywhere from four to five hours.

"Q. Would these plaintiffs actually go in the truck and physically stack packages? A. If I needed them up there, they did.

"Q. During the course of each day can you tell the Court whether these plaintiffs got in the truck to stack packages? A. What do you mean by that?

"Q. I mean once during the day did any of these plaintiffs get it? A. Yes, sir.

"Q. Or did they do it more than once? A. They done it more than once. As many times as I needed them.

"Q. When you say as many times as you needed them what would be the thing that worked out those needs? Was it the weight of the packages. A. The weight of the packages. Sometimes they would have too much packages to the tail-gate, which I would have them walk in the take to the front of the truck."

Irving Yudenfreund, also a driver for defendant, testified in part:

"Q. Before you quit did these plaintiffs or any of them bring any freight from any customers of Pyramid to be loaded onto this truck that was parked on 39th Street? A. Yes, they did.

"Q. Did you ever see any of these plaintiffs get inside of the truck? A. Plenty of times.

"Q. What did they do when they got inside the truck? A. They helped me load, or they helped—for instance, there were three cartons we put in one tier. If there were more than the three cartons you had to put it on top; naturally one of these two men couldn't do that alone. I would call anybody there and put it up on top, to help us load.

"Q. During each day were there occasions when one or more of these individuals got into this truck and helped you do what you just described? A. Yes."

In Ex parte MC-2, supra, the Interstate Commerce Commission, in discussing "loaders", spoke of those workers " * * * whose sole duties are to load and unload motor vehicles and transfer freight between motor vehicles and between the vehicles and the warehouse." [P. 134] The Commission went on to stress the importance of proper loading for safety of operation and concluded that " * * * loaders devote a large part of their time to activities which directly affect the safety of operation of motor vehicles operated in interstate or foreign commerce * * *", and that it had power to establish qualifications and maximum hours of service for them under Section 204(a) of the Motor Carrier Act. [P. 134]

It may be seen from the views of the Interstate Commerce Commission that "loaders" within its definition have a certain amount of skill and judgment attached to their duties in the proper distribution of weight in order to insure safety of operation.

However, the inference seems clear from all the circumstances here that the plaintiffs were not "loaders" within this definition; and that their duties in this respect were merely incidental to their main duties. Whatever skill and judgment affected the operation seemingly reposed in the driver or the helpers and not in the plaintiffs.

At page 708 of 330 U.S., at page 960 of 67 S.Ct. of the Supreme Court's opinion in this case, Justice Burton remarked that " * * * the mere handling of freight at a terminal, before or after loading, or even the placing of certain articles of freight on a motor carrier truck may form so trivial, casual or occasional a part of an employee's activities, or his activities may relate only to such articles or to such limited handling of them, that his activities will not come within the kind of 'loading' which is described by the Commission and which, in its opinion, affects safety of operation."

I believe that these remarks fit the plaintiffs.

The defendant stresses the recent case of Morris v. McComb, 332 U.S. 422, 68 S.Ct. 131, 92 L.Ed. 83, in which the Supreme Court held that the Commission had power to establish maximum hours of service for drivers and mechanics of a common carrier by motor vehicle whose services in interstate commerce constituted only 3% to 4% of its total carrier services throughout the year, and the performance of such services by the drivers and mechanics was mingled with their performance of other like services not in interstate commerce. But the case is not pertinent here because it was undisputed that the employees there *were* full time drivers and mechanics; and the Court pointed out that a common carrier engaging in interstate business must perform that service in accordance with the Commission's requirements.

As was stated in Levinson v. Spector Motor Service, 330 U.S. 649, 674, 67 S. Ct. 931, 944, 91 L.Ed. 1158, it is "the character of the activities rather than the proportion of either the employee's time or of his activities that determines the actual need for the Commission's power to establish reasonable requirements with respect to qualifications, maximum hours of service, safety of operation and equipment."

This has been a rather difficult case to decide because of the factual situation. There is an irreconcilable difference between the testimony of the witnesses for the plaintiffs and the witnesses for the defendant. There is also a difference between the stipulated facts and the testimony given before me, particularly that given by the plaintiffs themselves. It has been extremely hard to evaluate the testimony. The whole general picture, however, impresses me with the fact that these men were not loaders in the sense that their activity materially affected safety. As I see the whole picture, I do not feel that the activity of the plaintiffs was such as to bring them under the control of the Interstate Commerce Commission for the purpose of establishing qualifications and maximum hours of service.

■ I hold that the plaintiffs are not "loaders" over whom the Interstate Commerce Commission has jurisdiction, in that they do not affect safety of operation by their incidental duties in connection with loading, and therefore are entitled to recover overtime in accordance with the Fair Labor Standards Act.

■ One further question remains.

Paragraph IX of the stipulation provides as follows: "IX. It is agreed that if plaintiffs are entitled to recover for overtime claimed due, plaintiffs are also entitled to recover double said amount as liquidated damages, in accordance with Section 16(b) of the Wage and Hour Act."

The defendant has now moved for leave to amend its answer in order to interpose as a second partial defense Section 11 of the Portal-To-Portal Pay Act of 1947 [6]

which provides: "In any action commenced prior to or on or after May 14, 1947 to recover unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended, if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in Section 16 (b) of such Act."

That Act became law on May 14, 1947 some six weeks after the decision of the Supreme Court in this case.

The plaintiffs insist that Paragraph IX of the stipulation precludes the defendant from assertion of Section 11, but they offer no authority for such objection, and there is none. That paragraph, as far as liquidated damages are concerned, was merely an agreement to give the plaintiffs their due under the law as it existed at that time. It was a gratuitous expression in that its absence could not have affected plaintiffs' absolute right to liquidated damages if their claims were successful. The law has changed since the stipulation was executed and the defendant is entitled to take advantage of it. Darr v. Mutual Life Insurance Co., D.C.S.D.N.Y. 1947, 72 F.Supp. 752.

■ Section 11 specifies two conditions under which the Court may, in its discretion, award no liquidated damages, or may award any amount thereof.

The employer must show to the satisfaction of the Court that (1) his act or omission was in good faith, and (2) he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act.

The defendant elicited the testimony of Louis A. Rosenthal, its Vice-President and General Traffic Manager, in support of its defense under Section 11. He testified that the defendant omitted to pay overtime com-

---

[6] 29 U.S.C.A. § 260.

pensation to the plaintiffs because of his belief that they were under the jurisdiction of the Interstate Commerce Commission. The Fair Labor Standards Act became law on June 25, 1938. The earliest claim in suit dates from October 24, 1938. Section 13 (b) (1) of the Act exempted from its operation any employee with respect to whom the Interstate Commerce Commission had power to prescribe qualifications and maximum hours of service. Rosenthal asserted that it was generally assumed in the industry that all employees of motor carriers were exempt.

On May 9, 1939, the Commission ruled in Ex parte MC-28, 13 M.C.C. 481 that its power extended only to those employees of motor carriers whose activities effected safety of operation. An appeal was prosecuted from this ruling which resulted in the holding that Commission's authority extended to all motor carriers' employees whether they effected safety of operation or not. See American Trucking Association v. United States, D.C. 31 F.Supp. 35. A further appeal to the Supreme Court of the United States resulted in a reinstatement of the Commission's view. United States v. American Trucking Association, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345. However, the question of what activities concerned safety of operation still remained to be decided, and it was not until Ex parte MC-2, supra, on May 17, 1941, that "loaders" were deemed subject to the power of the Commission. The defendant believed and still believes that the plaintiffs are "loaders" subject to this power.

The plaintiffs concede the truth of this relation, but argue that it states a showing of bad faith in that the defendant has indicated no action on its part to ascertain whether or not the plaintiffs were exempt, and they point especially to the defendant's complacence after the decision of the Supreme Court in the American Trucking Association case. It is true that the defendant has evidenced no individual efforts to ascertain the plaintiffs' standing during the periods in suit, but immediately after the decision of the Supreme Court, the American Trucking Association instituted the proceeding before the Commission which resulted in the Ex parte MC-2 ruling. The defendant offered copies of "Transport Topics" a trade paper published by the American Trucking Associations, Inc., carrying accounts of the progress of the question.

I believe all of these circumstances clearly show that the defendant had reasonable grounds for believing that it was not violating the Act. The uncertain condition of the problem rendered highly difficult a correct course of action during the periods in suit. In fact, the question is still in controversy, as the recent decisions of the Supreme Court manifest.

Further, all the circumstances convince me that the defendant's omissions were in good faith, and that its actions were completely consistent with such conviction.

I award, therefore, in my discretion, no liquidated damages to plaintiffs.

It is not necessary for me to set forth the amount due each of the plaintiffs. The parties may ascertain that from the stipulation and exhibits. The parties have ascertined this amount as the stipulation and exhibits indicate. The judgment should contain the correct amount. If there is any dispute about it, the parties may appear before me.

Plaintiffs' attorneys are entitled to a counsel fee herein. The amount should appear in the proposed judgment. When the judgment is submitted to me, either side may present affidavits or any memoranda in connection with the fixing of the amount.

The plaintiffs will settle the judgment in accordance herewith.