BROACH *v.* McPHERSON.

4-9751                                     248 S. W. 2d 355

Opinion delivered April 28, 1952.

458

*Paul K. Roberts,* for appellant.

*Edwin E. Hopson, Jr.,* for appellee.

GRIFFIN SMITH, Chief Justice. An action brought by Broach for overtime, pay differential, and the incidents allowable to a prevailing litigant under the Fair Labor Standards Act of 1938, as amended, 29 USCA, §§ 206-7, was lost by the plaintiff when the defendant's motion for an instructed verdict was sustained on the ground that there was no testimony showing that a substantial part of the defendant's business was interstate commerce. It is argued in appellee's brief that evidence was lacking to establish McPherson's ownership or interest in the rice shipped into other states, but seemingly the trial judge did not rest his conclusions upon this contention. Neither does it appear that the court was convinced that inferences of McPherson's ownership of the mill were not substantial.

The complaint alleged that during the first four months of 1950 McPherson, doing business as McPherson Rice Milling Company, while engaged "in the production of rice and associated by-products for interstate commerce," employed Broach as a mill night watchman on an hourly pay basis of 50c; that the contract was for a 40-hour week, but that from January 28 to April 16 the assignment required 77 hours per week, etc. The amount involved is not an issue here, hence details are omitted.

There was testimony showing that the rice mill was within the city limits of McGehee near the main line of the Missouri Pacific Railway. McPherson employed appellant and when work was started took him around and explained what the duties were. Six "stations" were

pointed out—places to be watched on different floors and around the premises. Rice was being milled during the period of employment. Appellant worked from seven in the evening until six o'clock in the morning, seven days a week. A pay envelope introduced showed 77 hours at 50c per hour. Before going to work appellant was told how many hours he would be required to work and what the rate of pay would be. The inspection work included a large warehouse south of the mill—"behind it."

The court read into the record a stipulation that ". . . the waybills and bills of lading of the Missouri Pacific Railroad Company are true and correct. Each correctly reflects the information contained therein. Where a waybill or bill of lading specifies that a carload of rice left the McPherson Rice Milling Company . . . the car did, in fact, so leave, for the destination shown on the bill of lading. It is further stipulated that the various shipments of the carloads of rice contained milled rice which had been processed at the plant of the defendant, McPherson Rice Milling Company of McGehee."

The list disclosed that during the first nine months of 1950 the mill shipped 37 cars of rice. One went to Harrison, Arkansas. The others were consigned to cities and towns in other states. The stipulation shows date of shipment, car number, consignee, destination, and the waybill number. Exhibits were government documents disclosing that McPherson Rice Milling Company paid social security and withholding taxes incidental to appellant's wages.

A case frequently cited holds that an employe seeking to recover overtime compensation under subdivisions of the Fair Labor Standards Act applicable to the litigation there pending (opinion July 27, 1948) was required to establish that the employer was engaged in interstate commerce, that the claimant performed work "which consisted of the production of goods for interstate commerce," that while engaged in the performance of such work the employe had been required to work overtime and was denied his proper pay. *Burke* v. *Mesta Machine Co.*, D. C. Pa., 79 F. Supp. 588.

A controversy regarding the status of two night watchmen supplies reasoning by authority we must respect. *Kirschbaum Company* v. *Walling,* 316 U. S. 517, 62 S. Ct. 1116, 86 L. Ed. 1638. The case was decided June 1, 1942. The majority opinion (a lone dissent having been recorded) was written by Mr. Justice FRANKFURTER, who commented that "To search for a dependable touchstone by which to determine whether employes are 'engaged in commerce or in the production of goods for commerce' is as rewarding as an attempt to square the circle." The opinion mentioned a statute of August 11, 1939, amending the Federal Employers' Liability Act, by which the scope was extended to employes whose work "shall in any way directly or closely and substantially affect" interstate commerce; but Judge FRANKFURTER then returned to the Fair Labor Standards Act and said: "Since the scope of the [Fair Labor] Act is not coextensive with the limits of the power of Congress over commerce, the question remains whether [the two watchmen and other employees concerned] fall within the statutory definition of employes 'engaged in commerce or in the production of goods for commerce,' construed as the provision must be in the context of the history of federal absorption of governmental authority over industrial enterprises. . . . . The real question is how the lines are to be drawn—what are the relevant considerations in placing the line here rather than there."

In dissenting from the holding that the watchman and other respondents were covered by the Act, Mr. Justice ROBERTS said he would disaffirm the conclusion that the power of Congress reached the purely local activities in question. If it did, said Judge ROBERTS, "the commerce power alone would support regulation of any local action, since it is conceivable that such activity, however remotely, 'affects' commerce or is 'necessary' to the production of goods for commerce."

Reference to the dissenting opinion is for the purpose of showing that the court's majority considered and rejected a construction that would exclude the watchmen.

It has been said that the requirement of increased pay for overtime is a remedial measure adapted to needs of an economic and social program, rather than a police regulation adapted to rigid enforcement required in safety programs. *Levinson* v. *Spector Motor Service*, Ill. 1947, 67 S. Ct. 931, 330 U. S. 649, 91 L. Ed. 1158. The case involved the right of the Interstate Commerce Commission, under § 204 of the Motor Carrier Act of 1935, to establish qualifications and maximum hours of service with respect to any "checker" or "terminal foreman," a substantial part of whose activity in that capacity consisted of doing, or immediately directing, the work of one or more "loaders" of freight for an interstate motor carrier. The contention was that § 7 of the Fair Labor Standards Act was not applicable because of language in the Motor Carrier Act, 49 Stat. 546, U. S. C. § 304, etc.

The amendment of Oct. 26, 1949, 203(j) defines "produced" by saying that an employe shall be deemed to have been engaged in the production of goods "if such employe was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any closely related process or occupation directly essential to the production thereof, in any State."

Whether an employe is covered by the wage and hour provisions of the Fair Standards Labor Act depends on the nature of the particular person's employment; and the fact that all of the employer's business is not shown to have an interstate character is immaterial. *Snyder* v. *Dravo Corp.*, D. C. Pa., 1947, 6 F. R. D. 546. To be engaged in "production of goods for commerce," (language of the parent Act) such employe need not come in actual physical contact with the goods. It is sufficient if the worker's duties constitute an essential or useful part of an integrated effort by which goods are produced for commerce. *McCombs* v. *Farmers Reservoir and Irrigation Co.*, C. C. A. Colo. 1948, 167 F. 2d 911, affirmed 69 S. Ct. 1274, 337 U. S. 755, 93 L. Ed. 1672.

Firemen and guards employed by a corporation to protect its plant (owned by the United States and erected

for assembly and modification of military aircraft which were flown from the plant to various places outside of the state in which the corporation's plant was located, which plant was operated by the corporation pursuant to a contract with the United States), were "engaged in the-production of goods" within the meaning of the Fair Standards Labor Act. *Culkin* v. *Glenn L. Martin Neb. Co.*, D. C. Neb. 1951, 97 Fed. Supp. 661. To the same effect is *Russell Co.* v. *McCombs,* 187 F. 2d 524. There, however, the employer, a corporation, admitted that it was engaged in interstate commerce, but contended that a night watchman did not come within the terms of the Act. The opinion was written by Judge LEON McCORD who said that the appellee night watchman was engaged in commerce and in the production of goods for commerce in such degree as to bring him within the scope of the Fair Labor Standards Act. The district court's holding, said Judge McCORD, that the watchman's activities "contribute[d] so materially and directly to the flow of goods in commerce 'as to be in practice and in legal contemplation a part of it' is in accord with the prevailing cases." More than half a dozen decisions were cited.

Facts in the opinion showed that the watchman was required to unlock the yard gate for motor freight trucks. He also guarded the yard in which the freight motor trucks were parked and where merchandise was loaded onto freight cars on tracks extending into the employer's property. Still another case in point is *Walton* v. *Southern Package Corp.,* 320 U. S. 540, 64 S. Ct. 320, 88 L. Ed. 298.

The fundamental upon which the cases rest is that the manufacturing plant is essential to production of goods, and that management in the exercise of business judgment or discretion has said, when a watchman is employed, that protection is essential to the functions resulting in commerce among the states. Goods intended for interstate shipment may be stolen, mill or factory may be destroyed by fire, or serious damage by flood or fire might result but for the watchfulness of one employed to make the inspections thought by management to be necessary.

Appellee thinks that failure of the stipulation to show who the consignor or seller was constitutes a break in the chain of evidence which leaves to speculation and conjecture the essential fact of ownership of the rice actually shipped. For all one is able to gather from the record, says appellee, the commodity may have been sold before interstate movement began. The stipulation does not, by express terms, show that at the moment movements began the Milling Company was owner; but the circumstances are such as to raise an inference of ownership or control. Our decisions dealing with circumstantial evidence were reviewed in an opinion by Judge JOHN E. MILLER of the U. S. District Court for the Western District of Arkansas in a statement to the effect that any issue of fact in controversy may be established by circumstantial evidence where the circumstances are such that reasonable minds might draw different conclusions. *Williams* v. *Oklahoma Tire & Supply Co.*, 85 Fed. Supp. 260.

We think the fact that the mill bore McPherson's name and that he was sued as owner; that McPherson personally employed appellee and showed him what work was to be done, how and where,—these were associated circumstances from which an inference of proprietary attachment would arise. But, being a substantial inference, it was sufficient to take the case to the jury on that issue. For the same reasons the case should have gone to the fact-finders for a determination of the question thought by the court to be controlling—that is, whether a substantial part of the mill's production entered commerce for delivery in another state.

The judgment is reversed and the cause is remanded for a new trial.