BROACH *v.* McPHERSON.

5-53                                                257 S. W. 2d 565

Opinion delivered April 27, 1953.

Rehearing denied June 1, 1953.

*Paul K. Roberts,* for appellant.

*Edwin E. Hopson, Jr., Virgil R. Moncrief* and *John W. Moncrief,* for appellee.

GRIFFIN SMITH, Chief Justice. Appellant sued for overtime, pay differential, and the incidents allowable in appropriate circumstances under the Fair Labor Standards Act of 1938, as amended. See 29 U.S.C.A. §§ 206-207. This is a second appeal. *Broach* v. *McPherson,* 220 Ark. 457, 248 S. W. 2d 355. An instructed verdict for the defendant was given and the action reversed under a finding that issues of fact were (a) whether the defend-

ant McPherson owned the mill, and (b) whether substantial parts of the mill's production entered interstate commerce.

On retrial a jury found in McPherson's favor and Broach has again appealed.

It is now certain that McPherson was an owner of the rice mill and there is no substantial testimony showing that an appreciable part of the mill's product did not enter into commerce among the states: indeed, the conclusion is inescapable that it did. But a new defense has been interposed. The present contention is that Broach, who admittedly served as a night watchman, was employed in two capacities—first as watchman for the mill, and secondly as watchman for the drier. Although the records did not distinguish for the first two weeks, and there was nothing on the pay envelope (containing cash and currency) showing that parts of appellant's services were apportioned to the mill and parts to the drier, McPherson testified that in employing appellant this was mentioned; and inasmuch as the drier received rice from local patrons and serviced it as a commodity distinct from the mill proper, two sets of accounts were maintained.

But even so, railroad shipments of milled rice disclosed that most of it went into interstate commerce, hence mill employees were within the Fair Labor Standards Act. In other words, the drier and mill, being integrated, were essential or useful one to the other. The extent to which this inter-relation went is not shown except by the testimony of appellee's accountant who said that he had made an abstract of book entries. At best, the bookkeeping was arbitrary, as shown by the transcript:

*Testimony of S. L. Toole:* "On [the first and second] payrolls fifty cents an hour appears. Then Mr. McPherson told me he had hired Mr. Broach at a certain price to do two jobs at different prices: one would be on the mill and the other would be on the drier. . . . Then Mr. McPherson said to me, 'I guess the best way

to break it down—pay him 77 hours. I am certain it will take more time for him to watch the drier and tool shed than the mill because, if I remember correctly, I think there are only two [punch-clock recording] stations in the mill—I won't say about that.' So I decided then I would give him three days a week as time on the mill and four days a week as time on the drier, and that is why I broke it down that way.''

In examining the transcribed testimony it is difficult to determine with complete accuracy what part of the statement was made by the witness and what part by McPherson. But appellant was not consulted regarding this apportionment of time, and during the entire period of his employment the milling company's pay envelopes were used. The present contention is that through some process not susceptible of explanation appellant is charged with knowledge that the gross amount was apportionable thirty-three hours per week for mill work at 75 cents, and forty-four hours assignable to drier duty at 31 cents. The witness admitted that during the time appellant worked ''there'' until the day of his leavetaking he did not see him.

It is not seriously disputed that a large part of rice dried at the so-called segregated installation passed to the mill, and necessarily, under any reasonable inference deducible from the evidence it became a commodity in interstate commerce.

But assuming that this was not shown and that McPherson's recollection of his conversation with appellant when the contract of employment occurred is correct, and that McPherson told Broach that he was to nightwatch for the mill and drier, there is no substantial testimony that Broach received instructions to do other than watch the mill and the drier plants—activities so closely related when the nature of the employment is considered as to preclude any theory of contractual segregation, apportionment, or pro rata of time.

A recent case construing the Fair Labor Standards Act is *Alstate Construction Company* v. *Durkin, Secretary of Labor,* 345 U. S. 13, 73 S. Ct. 565. A district

court action was brought against Alstate by the Wage and Hour Administration to enjoin the company from violating overtime and record-keeping provisions of the Act. Alstate is a Pennsylvania road contractor engaged in building, repairing, and reconstructing highways, etc. The company also maintains manufacturing plants at three points in Pennsylvania where a bituminous concrete road surfacing mixture is prepared, called amesite. Most of the material is applied to roads by Alstate's own employes or by customers who make independent purchases. Slightly more than 85% of the work involved in Alstate's operations in the Durkin suit was on interstate roads, railroads, or for Pennsylvania companies producing goods for interstate commerce, while a little less than 14% was done on projects that did not relate to interstate commerce. The opinion states that Alstate made no attempt to segregate payments to its employes "on the basis of whether their work involved interstate or intrastate activities."

In citing *Overstreet* v. *North Shore Corporation,* 318 U. S. 125, 63 S. Ct. 494, 87 L. Ed. 656, and *Pedersen* v. *Fitzgerald Construction Co.,* 318 U. S. 740, 63 S. Ct. 558, 87 L. Ed. 1119, attention was called to the court's holding (in the Overstreet case) to the effect that interstate roads and railroads are indispensable instrumentalities in the carriage of persons and goods that move in interstate commerce, and "We then held that because roads and railroads are in law and in fact integrated and indispensable parts of our system of commerce among the states, employes repairing them are in commerce. Consequently he who serves interstate highways and railroads serves interstate commerce. By the same token he who produces goods for these indispensable and inseparable parts of commerce produces goods for commerce. We therefore conclude that Alstate's off-the-road employes were covered by the Act because engaged in 'production of goods for commerce'."

A dissenting opinion by Mr. Justice Douglas, concurred in by Mr. Justice Frankfurter, takes an opposite view:—"The court reasons that if the man who is build-

ing or repairing an interstate highway is 'engaged in commerce,' the one who carries cement and gravel to him from a nearby pit is 'engaged in the production of goods for commerce.' Yet if that is true, how about the man who produces the tools for those who carry the cement and gravel or those who furnish the materials to make the tools used in producing the cement and gravel?''

The dissenting opinion is copied from to show how the two minority justices interpreted the court's opinion.

It is appellee's contention that justification for his apportionment of appellant's hour-time is found in exemptions, § 213(a) (2), 29 U. S. C. A., applicable to any employe engaged in any retail or service establishment the greater part of whose selling or servicing is in intra-state commerce; or in other provisions from which congressional intent may be inferred. A 1945 case in which exemptions are discussed is *Phillips* v. *Walling, Administrator,* 324 U. S. 490, 65 S. Ct. 807, 89 L. Ed. 1095. A headnote to the case in 157 A. L. R. 876, is: ''Exemptions from the operation of the Federal Fair Labor Standards Act must, in view of its humanitarian and remedial character, be narrowly construed, giving due regard to the plain meaning of statutory language and the intent of congress.'' While the Phillips-Walling case is not indentical with the litigation at bar in all of its factual aspects, the policy pronounced by congress has been stanchioned by U. S. decisions that adhere tenaciously to the liberal construction in favor of the worker mentioned in the Phillips case, and it is our duty to follow these decisions.

Appellant was unquestionably employed to nightwatch the rice mill—an instrumentality of interstate commerce. No effort was made to show that he was not, at all times—even while punching the recording clock at the drier—under continuing duty to supply what protection should be necessary to see that the mill was not molested. The mere fact that a watchman was employed is conclusive of the proposition that McPherson regarded as essential the security thus afforded.

We conclude, therefore, that as a matter of law appellee could not privately instruct his bookkeeper to make the apportionment of time in a manner depriving appellant of rights afforded by the Fair Labor Standards Act when in fact the watchman's duties were continuous. There was never a time when he was not under an employment obligation to guard the mill, irrespective of the superimposed activity respecting the drier.

The judgment is reversed. The cause is remanded with directions to render judgment pursuant to the federal statute.

Mr. Justice GEORGE ROSE SMITH, Mr. Justice PAUL WARD, and Mr. Justice SAM ROBINSON dissent.