## UNITED STATES ex rel. ARLINGTON & F. AUTO R. CO. v. ELGEN et al.
### No. 7093.

United States Court of Appeals for the District of Columbia.

Argued Feb. 9, 1938.

Decided May 2, 1938.

Chas. A. Douglas, Edmund D. Campbell, and Stuart T. Saunders, all of Washington, D. C., for appellant.

Elwood H. Seal, Corp. Counsel, and Lloyd B. Harrison, Sp. Asst. Corp. Counsel, both of Washington, D. C., for appellees.

Before GRONER, Chief Justice, and STEPHENS and EDGERTON, Associate Justices.

GRONER, C. J.

This is a petition for mandamus. Appellant is a railroad corporation chartered under the Virginia laws and, though located wholly in Virginia, is nevertheless engaged in interstate commerce as a common carrier. It operates a line of railroad some twenty miles in length from the town of Fairfax to the town of Rosslyn, which is situate at the District of Columbia line near the Virginia end of the Key Bridge.

Its operations are conducted by means of "auto-railers", motor cars capable of operation both on and off rails. The cars run on the rails except at the termini, at which points they leave the rails and are turned around. Appellant's operations are subject to the jurisdiction of the Interstate Commerce Commission under part 1 of the Commerce Act, 49 U.S.C.A. § 1 et seq., and appellant accordingly files regular reports and tariffs with the Commission. In the latter part of 1937, desiring to inaugurate a "pick-up and delivery" service for passengers originating in the District of Columbia and destined for points in the State of Virginia and a like service for passengers originating in Virginia destined for points in the District of Columbia, appellant applied to appellees, constituting the Public Utilities Commission of the District of Columbia, requesting them to consider and approve a route within the District of Columbia over which appellant might operate its cars.[1] The Commissioners declined to act on the application because they deemed it futile to designate a route for a carrier which was required to have, but did not have, the sanction of the Interstate Commerce Commission as to the proposed interstate operation. They, therefore, notified appellant that its application would be held in abeyance "until the petitioner [appellant] be granted authority to engage in interstate commerce within the District of Columbia, or determination be made by competent authority that no such permit is necessary". Appellant filed the present mandamus petition for the purpose of having the court below direct the Utilities Commission to assume jurisdiction of and consider the application and designate a route over the streets of the District of Columbia for the proposed operations. The grounds and theory of the petition are that appellant's proposed pick-up and delivery service is a "terminal service" by auto bus and, as such, no certificate of convenience and necessity or other authorization from the Interstate Commerce Commission is necessary. Appellees answered the petition, admitted most of the material facts, but denied that the proposed service would constitute a "terminal" or "pick-up and delivery service", insisting it was either in effect an "extension of the lines" of appellant, in which case admittedly a certificate of convenience and necessity was required by part 1 of the Commerce Act, 49 U.S.C.A. § 1 et seq. or was a motor carrier operation in interstate commerce, requiring a certificate under part 2 thereof, 49 U.S.C.A. § 301 et seq. Appellant demurred to the answer and, after hearing, the trial judge filed a memorandum overruling the demurrer. He found that appellant is a railroad, but held that it could not engage in the proposed service in the District of Columbia without first obtaining a certificate from the Interstate Commerce Commission under part 1 of the Act. Appellant elected to stand upon its demurrer and judgment was entered dismissing its petition.

On this appeal the single question is, whether or not appellant must obtain a certificate under the provisions of either part 1 or part 2 of the Interstate Commerce Act before it can begin the proposed service, and the answer to the question, as we think, depends upon whether or not the city of Washington,—which now embraces the whole of the District of Columbia,—is within and is a part of appellant's terminal district. Or, stated somewhat differently, whether appellant's proposed operation is a line-haul service or a terminal service.

Appellant's cars are propelled by gasoline motors. They are, as we have seen, capable of operating on or off rails. The proposed operation from Rosslyn into and through the city of Washington would be wholly off-rail and to all practical purposes would be the same as an ordinary motor bus operation. Appellant does not propose to engage in intra-city business in Washington but will confine its proposed

---

[1] D.C.Code 1929 (Supp. III), T. 6, § 243(e):

"The [District] commissioners may in the administration of this chapter, exercise any power or perform any duty conferred on them by this chapter through such officers and agents of the District as the commissioners may designate * * * Provided further, That as to all common carriers by vehicle which enter, operate in, or leave the District of Columbia, the power to route such vehicles within the District of Columbia, to regulate their equipment other than that specifically named elsewhere in this chapter, to regulate their schedules and their loading and unloading, to locate their stops, and all platforms and loading zones and to require the appropriate marking thereof, is vested in the Public Utilities Commission of the District of Columbia * * *."

new operation to taking on passengers destined for points on its line outside the District and discharging in the District passengers from points in Virginia. If we should be able to find that its Rosslyn terminal district embraces, for the purposes it has in mind, the city of Washington, its right to operate a pick-up and delivery service would be co-equal in all respects with that of the steam railroads having terminals in that city. And this is true because appellant, like the steam railroads, is an interstate common carrier of persons and property, has the power of eminent domain, operates on its private right-of-way, and is and has always been subject to the jurisdiction of the Interstate Commerce Commission. In the recent case of American Trucking Ass'ns v. United States, D. C., 17 F.Supp. 655—a statutory court case in which the opinion was written by one of the judges of this Court—the decision of the Interstate Commerce Commission in Pick-Up and Delivery in Official Territory, 218 I.C.C. 441, was affirmed, and there it was held that a certificate of convenience and necessity is not required of railroads as a condition of providing what the Commission calls an accessorial terminal service, or pick-up and delivery service, within the respective terminal districts of the railroads involved. This grows out of the fact that such a service is regarded purely as a terminal facility and ordinarily includes the collection from and delivery of freight to house or store doors within a restricted area—called a terminal district. Whenever the service extends beyond the terminal district it becomes what the Commission designates as a "line-haul", and is in that respect an extension of the line of the carrier, as to which, by express provisions of the Commerce Act, a certificate of convenience is necessary.

From the foregoing it will be seen that the question involves defining "terminal district" in point of area. But to announce an invariable rule is by no means easy, and the difficulty was recognized years ago by the Interstate Commerce Commission in Tariffs Embracing Motor-Truck or Wagon Transfer Service, 91 I. C.C. 539, where the Commission said:

"In many cases it is difficult to distinguish between a line-haul service and a terminal service, and we have always decided each case upon its merits in that respect."

Appellant relies upon the decision of the Third Circuit in New York Dock Ry. v. Pennsylvania R. Co., 62 F.2d 1010. In that case suit was brought by certain common carriers and others to enjoin the Pennsylvania Railroad Company from establishing a store door delivery service in the metropolitan area of New York City without first obtaining a certificate from the Commission. The theory of the opposition was that the practice proposed by the Pennsylvania was not a "terminal service" but an extension of the company's line of railroad beyond the limits and area of its physical rail terminals at Jersey City by the use of motor busses and trucks, operating from Jersey City to New York. The court found this view not sustained by the evidence, holding, to the contrary, that the entire greater city of New York was the actual physical eastern terminus of the road, and that the proposed new service was a terminal service entirely within its terminal district. The parallel which appellant finds between that case and this is that the Pennsylvania's eastern rail terminus was actually at the New Jersey water front opposite the city of New York just as appellant's eastern rail terminus is at or near the Potomac water front opposite the city of Washington, and that in the case of appellant, as in the case of the Pennsylvania, the so-called pick-up and delivery service was to be through the use of motor busses, across bridges into the metropolitan area—in the one case, New York, in the other, Washington. On this basis appellant draws the conclusion that when it runs its vehicles into the District of Columbia without the necessity of laying rails or trackage, it is merely extending its transportation service and not its line of railroad. But the important difference is that in the case of the Pennsylvania Railroad there was no denial that the metropolitan city of New York had been for years a well recognized part of the terminal district of that railroad, whereas the same is not true in appellant's case as to Washington. The thought we have in mind in this respect can perhaps be best explained by quoting from the New York Dock Ry. opinion as follows (page 1012): "There is no secret or deception in what the railroad company is trying to do. It, avowedly, is trying to meet motor truck competition which has an advantage over rail transportation in the store door receipt and delivery of freight. It does not intend to invade new territory by extending its line of tracks or expanding its lighterage facilities, the equivalent of

tracks, a foot beyond their present termini, or by establishing new terminals, but intends by its proposed practice of co-ordinating rail transportation and truck service to reach its patrons, present and prospective, within New York City—territory into which it now enters and which it now serves—by delivering and receiving at their doors freight which it has transported or is about to transport over its rails and thereby hold to itself the traffic which it still has and, if it can, take traffic from competing truck carriers along the highways and, of course, take local traffic from the complainants." As found by the court the terminal area of the Pennsylvania, embracing the entire metropolitan city of New York, had been established years before through the extension of its line of rail by car-floats and ferries. It was in this respect in the same position as a railroad having a terminus within the corporate limits of a city, whose right to establish pick-up and delivery service without a certificate was upheld in the decision in American Trucking Ass'ns Case, supra. The proposed new service which appellant wishes to establish is not, however, a change of method but is a new service. Appellant would cross a state line into the District of Columbia, into an area it does not now directly serve, and render a service which it has not hitherto provided, in the proposed manner or otherwise. If appellant, with its terminal in Virginia, may thus invade a new territory, the question of how far such invasion might go would introduce a new problem for the solution of which, so far as we know, there is no yardstick, but obviously as to which there is, in the very nature of things, a limit. For otherwise the provision of the law prohibiting extensions of lines of railroad without approval by the Commission would be set at naught.

The history and background of the expression "terminal facilities," as applied to what is called pick-up and delivery service, is set out at great length in the Commission's opinion in Pick-Up and Delivery in Official Territory, 218 I.C.C. 441, to which we have referred. Stated in condensed form, it shows that the practice embraces drayage transfer or a limited store door delivery service in place of delivery or acceptance of freight at station platforms. In other words, it is in large measure a substitution, impelled by motor truck competition, of facilities of the railroad in place of those of the consignee of the freight, through local trucking agencies; and in all the cases that we have any notice of, including the decisions of the Commission, it is confined to the ordinary city terminal area of the railroad in question. Bearing in mind the Commission's statement that the question of terminal area must in each case be decided on its merits, we find one or two decisions of the Commission which shed some light on the subject. In the case in 218 I.C.C. at page 445, the Commission said: "The service commonly referred to as pick-up and delivery is defined in the tariff substantially as covering the transportation of freight between the premises of the carrier's freight station and a platform or doorway directly accessible to trucks at the consignor's or consignee's warehouse, factory, store, place of business, or private residence. Unless otherwise specifically indicated, the service is available only in areas within the corporate limits of cities or towns or, in the case of points not having corporate limits, within a radius of 1 mile from the carrier's freight station."

In Drayage and Unloading at Jefferson City, Mo., 206 I.C.C. 436, it appeared that the Missouri-Kansas-Texas Railroad extended from St. Louis to Kansas City along the north bank of the Missouri River through North Jefferson, a point about one and a half miles north of Jefferson City. The rails of the Missouri-Kansas-Texas did not reach Jefferson City, but the railroad had served it first by wagon transfer and later by motor vehicle. This method of freight delivery was attacked by the Missouri Pacific on the grounds on which the Utilities Commission bases its refusal to act in the present case. The Commission said: "It is clear from the record that the corporate limits of Jefferson City do not include North Jefferson, and that the switching limits of North Jefferson do not embrace those of Jefferson City, or vice versa. Consequently, Jefferson City is not now, nor has it ever been, a point on the rails of the M-K-T., and the service between that point and North Jefferson must be regarded as a road-haul service and not an accessorial terminal service. This fact distinguishes this service from that referred to as rendered by the east-side lines to and from St. Louis and by the New Jersey shore lines to and from Manhattan Island."

These quotations show, we think, that pick-up and delivery service, as an accessorial terminal service, may not be giv-

en indiscriminately at the wish of the carrier but must be confined within that area which properly constitutes the carrier's terminal district; and they show also, we think, that the Commission has not undertaken to establish any criteria which can be universally applied.

In addition to the uncertainty which the lack of authority on the subject creates, we have here nothing in the way of evidence to aid us in reaching a decision. The case was decided on bill and answer. The averments of each we need not repeat. It is enough to say that appellant merely contends that it is entitled to give pick-up and delivery service as a part of its terminal service. The assumed premise is that the service will be terminal service. But nothing is shown from which this follows, except the fact that appellant's present terminal abuts the boundary line between Virginia and the District of Columbia. We could not in any event, therefore, undertake to decide the case in its present condition. But we think we ought not to decide it anyhow. It might very well be that if the case arose in another form we would be compelled to consider and decide the question presented here. Cf. Texas & Pacific Ry. Co. v. Gulf, etc., Ry. Co., 270 U.S. 266, 46 S.Ct. 263, 70 L. Ed. 578. But this is a mandamus case, and the granting of relief rests largely in our discretion. There is nothing to prevent appellant from making application to the Interstate Commerce Commission for a certificate of convenience and necessity. The granting of a certificate, if one is necessary, or the holding that one is unnecessary, if such be the case, will authorize—indeed, will require—the Utilities Commission to designate a route over which appellant may operate, and there is nothing to indicate the slightest reluctance on the part of the Utilities Commission to be bound by the decision of the Commerce Commission. The question of what constitutes a terminal district is so largely one of fact and so far involves considerations calling for the expert knowledge in technical matters of transportation, that we are convinced appellant should pursue its remedy before the Commerce Commission rather than before the courts. It will be time enough for appellant to apply to the courts for relief when the Commerce Commission, after holding that a certificate of convenience and necessity is required, wrongfully refuses to grant one. As the matter now stands, we think

that appellant has an adequate administrative remedy which it has not pursued and that the Supreme Court cases are not favorable to our assumption of authority over subjects committed initially to the jurisdiction of the Commission. See Texas & Pacific Ry. Co. v. American Tie & Timber Co., 234 U.S. 138, 34 S.Ct. 885, 58 L. Ed. 1255; Northern Pacific Ry. Co. v. Solum, 247 U.S. 477, 38 S.Ct. 550, 62 L. Ed. 1221; Great Northern Ry. Co. v. Merchants' Elev. Co., 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943.

Affirmed.