281 F.2d 34
 108 U.S.App.D.C. 201
 Ezra Taft BENSON, Secretary of Agriculture of the United
States, and Commodity Credit Corporation, Appellants,
v.
UNITED STATES of America et al., Appellees.
J. G. BOSWELL AND COMPANY et al., Appellants,
v.
UNITED STATES of America et al., Appellees.
 Nos. 15359, 15360.
 United States Court of Appeals District of Columbia Circuit.
 Argued Feb. 24, 1960.
Decided June 10, 1960, Petition for Rehearing Denied July 19, 1960.
 
 Mr. Donald A. Campbell, Atty., Dept. of Agriculture, with whom Messrs. Oliver Gasch, U.S. Atty., and Neil Brooks, Asst. Gen. Counsel, Dept. of Agriculture, were on the brief, for appellants in No. 15,359.
 Mr. Walter D. Matson, Washington, D.C., with whom Mr. James K. Knudson, Washington, D.C., was on the brief, for appellants in No. 15,360.
 Mr. C. H. Johns, Jr., Associate General Counsel, Interstate Commerce Commission, for appellee Interstate Commerce Commission.
 Mr. Frederick G. Pfrommer, San Francisco, Cal., of the bar of the Supreme Court of California, pro hac vice, by special leave of court, with whom Mr. John Guandolo, Washington, D.C., was on the brief, for appellees Railroad Companies. Messrs. Lawrence Cake and Raymond A. Negus also entered appearances for appellees Railroad Companies.
 Mr. Samuel D. Slade, Chief, Appellate Section, Civil Division, Dept. of Justice, entered an appearance for appellee United States of America.
 Before Mr. Justice REED, retired,* and FAHY, and BURGER, Circuit judges.
 Mr. Justice REED, sitting by designation.
 
 
 1
 These are appeals from an order of the United States District Court for the District of Columbia granting a motion for summary judgment by the Interstate Commerce Commission and the intervening railroad carriers, and dismissing a complaint.*0 Judge Sirica held that the action of the Commission in approving certain railroad tariffs on cotton as hereinafter described was based on substantial evidence, and reasonable. / 1/ The complaint in the present proceeding was filed January 3, 1958, in the United States District Court for the Southern District of New York by Mr. Benson as Secretary of Agriculture under the authority of the Agricultural Adjustment Act of 1938. / 2/ Many shippers of cotton from the Southwest United States to Gulf and Pacific ports, and Eastern stats, joined as plaintiffs. Many carriers intervened as defendants. The case was later transferred for the convenience of the parties to the District Court for the District of Columbia.
 
 
 2
 The complaint sought to annul and set aside actions of the Interstate Commerce Commission[3] In denying reparations in an administrative proceeding brought under 49 U.S.C.A. 9 against numerous railroad companies that had carried baled cotton at rates alleged inapplicable because they were higher than those authorized by the Commission. The District Court's judgment left the ruling of the Commission intact.
 
 
 3
 The rates challenged in the reparations proceeding and here were the final result of a ruling by the Interstate Commerce Commission in proposed general increases of tariffs which became effective February 25, 1956.[4] An additional six percent rate increase over several former percentage increases was there allowed because of actual increases in the cost of performing transportation services. All increases were directed to be made on the 'basic freight rates and charges of the railroads.'[5] The quoted words have been the standard direction for applying raises in the Increased Freight Rate Cases.[6]
 
 
 4
 The heart of the controversy is the method that is to be applied in calculating the increases in the existing tariffs for the cotton shipments. Freight charges on cotton have always been calculated upon the hundred pounds. Since cotton weighs lightly but bulks large, the shippers and carriers found it mutually profitable to compress cotton for transporation. The development of the powered compress in the nineteenth century made a contribution in simplifying the handling of cotton comparable to that made by Whitney's invention of the gin to remove the seed from the lint in the eighteenth century, or the development of the mechanical picker in the twentieth century. To encourage compression the railroads many years ago introduced into their tariffs as an item an allowance for compression frequently limited to 'not to exceed twenty-five cents per hundred pounds.' Compression ordinarily costs the shipper more than this allowance. The cost varies according to the charge at the particular compress. Tariffs were developed called compression-in-transit tariffs, abridged to 'c.i.t.' Whatever their precise form, there was a freight rate or charge to the shipper of so much per hundred pounds for the carriage of the cotton, and an allowance to the shipper of not to exceed so many cents per cwt for compression, whether the cotton was compressed prior to or in the course of shipment.
 
 
 5
 As stated above, when subsequent increases of rates were approved, the Commission always directed that the increases were to be applied to 'the basic freight rates and charges of the railroads.' The railroads carried out the order by adding the allowed percentage increase each time to their freight charge, continuing to deduct on their freight bills the unincreased compression allowance. The shippers urged that the allowance for compression should be deducted before the allowed percentage increase is calculated. Following is an example of the difference in result. This is drawn from an exhibit and brief for appellants J. G. Boswell and Company, et al., shippers of cotton. It is:
 
 
 6
 'a shipment of 100 bales of cotton from Bakersfield to the port of Long Beach, California. In making out this freight bill the railroad agent made the following entries:
 
 
 7
 (Freight Bill No. 005, as rendered)
 
 
 8
 Weight Rate Prepaid
----------- ----------- -------
53575 40 214.30
 IC 15% 32.14
 -------
 246.44
 
 Less 08 cents CWT comp
 
 9
 Allowance 42.86
 -------
 203.58
 Tax 6.11
 -------
 209.69
 
 
 10
 The rate of 40 cents per 100 pounds is the gross c.i.t. rate from Bakersfield to Long Beach. The c.i.t. rate minus the stated compression allowance of 8 cents per 100 pounds was applicable to a shipment of cotton which 'originated' at the Bakersfield compress. Since it was 'compressed in transit at point of origin,' the railroad did not advance the compression charges to the compress company. It will be observed that the railroad agent added the 15-percent Ex Parte 175 surcharge before he deducted the 8 cents per 100 pounds compression allowance, but that the 3-percent transportation excise tax was computed after the deduction of the compression allowance. The shippers contend that the freight bill entries, in accordance with the above quoted governing rules in the general increase tariffs, should have been as follows:
 
 
 11
 (Freight Bill No. 005, as revised by shippers)
 
 
 12
 Weight Rate Prepaid
---------------------- -------- --------
 (c.i.t.) 40
Less comp. allowance 08
 --------
 53575 (net) 32 171.44
Ex Parte 175 surcharge 15% 25.72
 --------
 197.16
 Tax 3% 5.91
 --------
 203.07
 
 
 13
 On this shipment the Southern Pacific Company collected and retained for transportation services $203.58. The shippers contend the amount paid should have been $197.16 and that they were overcharged in this instance $6.42.6A
 
 
 14
 The validity of the claim for reparations turns on the meaning of the terms 'basic freight rates and charges.' The shippers assert that the basic rate is the net amount paid by the shipper to the carrier after deduction of the carrier's allowance to the shipper for compression. That is the c.i.t. rate, less the compression allowance times the weight. The railroads say the basic rate is the c.i.t. rate and the compression allowance is a charge against that basic rate. The method urged by the shippers has been called by the litigants the net rate method; that urged by the railroads the gross rate method for calculating the allowed rate increase.
 
 
 15
 In the reparation cases, the Commission, which granted the increase, construed its language as the railroads interpret it. 'We believe that the defendants' (the railroads) method of applying the general increases was proper and produced the legal rates.'[7] 'The c.i.t. rate is a specifically published freight rate to which the findings in the ex parte proceedings contemplated that the authorized increases would be applied.'[8] Following each one of the Increased Freight Rate series of decisions, after the cost rises subsequent to World War II, the railroads have of necessity amended their tariffs to show the additional percentage allowed them by the then current increase.[9] Under the Interstate Commerce Act, 49 U.S.C.A. 15(7), the Commission had the duty in supervising the tariffs to satisfy itself of the 'lawfulness' of such rate. The method of calculation here under attack was accepted by the Commission. In the Allenberg case, the Commission said, 'The assailed rates * * * called c.i.t. rates, are the basic rates in effect on June 30, 1946, subject to subsequent general increases.' Revenue adjustments are normally superimposed on existing rate structures.[10]
 
 
 16
 The Commission was conscious, at the time the rate increases were being considered, of this very problem of applying the general increases to cotton tariffs subject to a compression allowance. Their opinion in the rate increase proceeding involved here considers the question and decides on a method other than that pressed by appellants to alleviate any inequities.[11] The method selected by the Commission was a rate increase holddown setting an upper limit on the amount of increase possible by application of the percentage increase. Appellants do not attack the reasonableness of the overall rate and there is no indication, therefore, that the hold-down method of preventing inequality has proven inadequate.
 
 
 17
 This consideration and approval by the Commission lends impressive weight to the railroads' contention that they followed the purpose and direction of the Commission in filing their tariffs. The Commission had power, legislative in character, to choose any reasonable method to calculate the proposed increase.[12] The dealing with the interpretation by the Commission, courts accept its factual findings with reasonable support in the record. Even if not a fine question of fact, the meaning of 'basic freight rates and charges' is one that depends upon the Commission's intention in employing the term, seeemingly devised by it for use in this very situation. Therefore courts will be slow to adopt any other meaning than the gloss put upon the phrase by the Commission, its author.[13]
 
 
 18
 The Commission's interpretation of the proper means of applying the rate increase was confirmed by it after the increase was granted at the time the carriers submitted their revised tariffs to the Commission for approval. The purpose of the increases was to compensate the railroads for rising operating expenses. The new tariffs, after application of the increases showed the rate in terms of the charge per cwt subject to deduction for the unincreased carrier's allowance for compression under the following note covering transit compression:
 
 
 19
 'Note 1.-- When the shipper has paid the compression charges direct to the compress plant on a shipment of compressed cotton tendered at a compress, such compression charges not to exceed 25 cents per 100 lbs. may be deducted from the total freight charges computed on the total weight at the CIT rate upon evidence of payment of such compression charges to the compress plant where the shipment was loaded.'[14]
 
 A tariff defined 'CIT rate' as follows:
 
 20
 'The term 'CIT rate' refers to a commodity rate on cotton, in bales, which rate includes the cost of compression or any proportion thereof or which includes an allowance for the cost of compression.'[15]
 
 
 21
 The increased tariffs took the 'existing rates in cents per 100 lbs' and added to that figure the percentage of increase allowed. In Item No. 10 of such a tariff in Ex Parte 175, 284 I.C.C. 589, these directions appear:
 
 
 22
 'Item No. 10.-- Application of Increased Rates and Charges-- Section 1. All charges for line-haul transportation services, also charges for out-of-line, indirect of back-haul services, special freight train service, rental charges for use of special equipment or other line-haul services, as provided in tariffs making reference to this tariff, * * * are increased 15 percent, * * *.
 
 
 23
 'In determining the applicable charge, first ascertain without reference to this tariff the amount of the line-haul transportation charges, also charges for out-of-line, indirect or back-haul services, special freight train service, rental charges for use of special equipment or other line-haul services, and then increase the amount so ascertained 15 percent, * * *'[16]
 
 
 24
 It will be noted that Item 10 does not refer in any way to the compression charge. Thus they applied the percentage increases to the rate which had been used for the gross cost to the shipper for transportation. These tariffs were approved by the Commission.
 
 
 25
 The Commission deemed the compression charge a part of the line-haul rate but a non-carrier service.[17] The line-haul rate is the charge for furnishing the line-haul transportation services, that is, those services or allowances that are considered a normal incident to the uninterrupted carriage of the goods from the origin to the destination. This is the transportation rate for carriage and is to be distinguished from 'accessorial' or 'terminal' services, for which additional charges are made.[18] The Commission is clearly empowered to determine what is embraced within the line-haul rate.[19]
 
 
 26
 It is true, as pointed out by Commissioner Murphy, the single dissenter in the Allenberg case, 289 I.C.C. at 587, that when the shipper himself pays for compression before loading or ships c.i.t., he deducts the allowable compress charges from the gross rate, but that does not make the net result the basic freight rate or charge.
 
 
 27
 The Commission's interpretation of the words 'basic rates and charges' is consonant with the Commission's purpose in granting the increase. Additional revenue was sought for the carriers. Only the tariff items that brought profit were increased, not the disbursement items.
 
 
 28
 'As a basis for their contention that only the net rate was increased by the general-increase tariffs, the complainants refer to the following statement in J. G. Boswell Co. v. Alabama G.S.R. Co., 276 I.C.C. 761, concerning such tariffs: 'It is obvious that the tariffs contemplated only increases in rates and charges from which the carriers were to derive revenue.' There is nothing in the later finding which requires application of the general increases to the net rate. This is true because the word 'revenue' as used in that finding is not synonymous with profit or net income. In other words, the defendants derive revenue from the gross rate as published in their rate tariff, and the disbursement of such revenue, through allowances or otherwise, can have no retroactive effect on the applicability of the general increases. The complainants also refer to decisions wherein a rate is defined as the net cost to the shipper of the transportation of his property. Such decisions were made concerning violations of the Elkins Act. Thus, while the net cost to the shipper is of primary importance in determining if a rebate has been given, it is of no moment in determining an applicable rate under section 6 of the act.'[20]
 
 
 29
 It is suggested by the appellants that, as is shown in the freight bills set out above, at page 37 of 281 F.2d, the fact that the transportation tax is paid in these bills on the 'net' sum is significant in showing that the 'basic rate' is the 'net' rate. Section 4271 of the Internal Revenue Code, 26 U.S.C.A. 4271, puts the tax 'upon the amount paid * * * for the transportation of property * * * by rail.' Federal Tax Regulations 1955, Part 143, 13, applies the tax 'to any payment, not specifically exempted, for the transportation of property.' But the basic freight rate is not determined by what the Government uses to calculate taxes. Nor is there any indication that the method used in the freight bills is a proper interpretation by the railroads making out the bills of the pertinent tax regulations. In any event, the definition of terms for purposes of taxation is irrelevant to the problem of defining the basic freight rate for purposes of the Interstate Commerce Act.[21]
 
 
 30
 In view of our agreement with the District Judge's determination as to the correctness of the railroads' application of the rate increases, we do not reach the additional question presented below as to whether the Commission was correct in its view that 16(3) of the Interstate Commerce Act barred the award of reparations on claims of the Commodities Credit Corporation relating to shipments delivered or tendered for delivery more than two years prior to the date of filing of the petition to intervene.
 
 
 31
 After the argument the court requested counsel to comment on the significance of a change in the method of stating tariff rates on cotton made by the carriers, effective in 1957. The effect is to state a rate for cotton by using the net rate. This eliminates the compression allowance as a factor in the basic freight rate. We think the change shows a simpler method for calculating the payments due the carriers, but we do not see that it affects the problem of what the Commission meant by the basic freight rate or charges.
 
 
 32
 The basic freight, we conclude, was, as the Commission ruled, the gross amount that was placed in the tariff for the line-haul transportation. The allowance was a charge against that rate. The Commission ruling upon that question is not only within its power to determine rate increases but seems to us to be a reasonable method of separating basic rates or line-haul rates from charges assumed by railroads that are, like compression, incidental to their services but beyond the carrier's power to control as to cost or method of operation. Where the assailed rate is the result of the application of internally consistent definitions and general criteria and the overall result reached is not unreasonable, there is no basis for disturbing the Commission's result.
 
 
 33
 Affirmed.
 
 
 
 *
 Sitting by designation pursuant to Sec. 294(a), Title 28 U.S.C
 
 
 **
 No. 15,360, J. G. Boswell and Co., et al. v. United States, is an appeal by the private shippers of cotton, affected by the increased rate orders, from the same order of dismissal. As the errors alleged are substantially the same, no separate opinion is necessary
 
 
 [1]
 Benson et al. v. United States, D.C.D.C.1959, 175 F.Supp. 264
 
 
 [2]
 52 Stat. 36, 7 U.S.C.A. 1291; Administrative Procedure Act, 5 U.S.C.A. 1009; Interstate Commerce Act, 49 U.S.C.A. 17(9)
 
 
 [3]
 Allenberg Cotton Co. v. Alabama Great Southern R. Co., 289 I.C.C. 71; 298 I.C.C. 577
 
 
 [4]
 Ex Parte No. 196, Increased Freight Rates 1956, 298 I.C.C. 279, 283
 
 
 [5]
 298 I.C.C. at 347. In the orders there were limitations of a maximum of 9 cents per hundred pounds increase on cotton rates. This maximum is not involved in this controversy. Id., at 319. It was used to relieve any undue burden on the shippers. See Ex Parte 206, 299 I.C.C. at 444
 
 
 [6]
 No. 168 (1948), 272 I.C.C. 695, 717; 276 I.C.C. 9, 113; No. 175 (1951), 280 I.C.C. 179, 189; 281 I.C.C. 557, 639
 6A Recovery of the extra 20 cents in transportation excise tax (3 percent of the $6.42) is beyond the scope of this action.'
 
 
 [7]
 Allenberg Cotton Co. v. Alabama Great Southern R. Co., 298 I.C.C. 577, 584. Cf. A. Levy & J. Zentner Co. v. Southern Pacific Co., 293 I.C.C. 279, for a determination involving a similar problem in the shipment of bananas
 
 
 [8]
 Allenberg Cotton Co. v. Alabama Great Southern R. Co., 289 I.C.C. 71, 77
 
 
 [9]
 This method was necessitated by the complications incident to the republication of new general tariffs. See The Fifteen Per Cent Case (1917) Ex Parte No. 57, 45 I.C.C. 303
 
 
 [10]
 298 I.C.C. at 579. See also id., at 316-319. State of New York v. United States, 331 U.S. 284, 350, 67 S.Ct. 1207, 91 L.Ed. 1492
 
 
 [11]
 298 I.C.C. at 317-319:
 'These interests also assail the lawfulness of the proposed application of the percentage increase on compressed-intransit (c.i.t) rates on cotton in carloads originating in California and Arizona. * * * The gist of the protest is that the percentage increases in these c.i.t. rates now proposed would be based on the full amount of the rates without regard for the fact that they include these allowances, which are not permanently retained by the carriers. The net result of the proposal is to increase these c.i.t. rates by amounts which are more than 7 percent of the revenues actually retained. * * *
 'We believe that there is some merit to the contentions of these protestants, but the suggested remedy of requiring the carriers to eliminate the amounts which they assume for compression from the rates before applying the increases would not be practicable or reasonable for general application in this proceeding. A much more practical and reasonable solution would be to fix a maximum increase on cotton which would accord the same treatement to all cotton in bales, in carloads.'
 
 
 [12]
 'When * * * the Commission declares a specific rate to be the reasonable and lawful rate for the future, it speaks as the legislature, and its pronouncement has the force of a statute.' Arizona Grocery Co. v. Atchison, T. & S.F.R. Co., 284 U.S. 370, 386, 52 S.Ct. 183, 185 76 L.Ed. 348
 
 
 [13]
 Cf. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456; Gray v. Powell, 314 U.S. 402, 411, 62 S.Ct. 326, 86 L.Ed. 301; Shields v. Utah Idaho Cent. R. Co., 305 U.S. 177, 180, 187, 59 S.Ct. 160, 83 L.Ed. 111; Levinson v. Spector Motor Service, 330 U.S. 649, 662, 672, 67 S.Ct. 931, 91 L.Ed. 1158
 
 
 [14]
 Pacific Southcoast Freight Bureau Circular No. 14-W, Agent J. P. Haynes, I.C.C. No. 1529, Effective December 22, 1951, Item 50
 
 
 [15]
 Id., Item 20
 
 
 [16]
 Supplement 2, Condensed Tariff of Increased Rates and Charges, No. X-175 A, I.C.C. Docket 30937
 
 
 [17]
 Allenberg Cotton Co. v. Alabama G.S.R. Co., 289 I.C.C. 71, 73, 75. See definition of CIT, supra, note 15
 
 
 [18]
 Whether as to particular situations a specific service is part of the line haul, or is accessorial or terminal is a frequently litigated issue. Cf. United States v. I.C.C., 352 U.S. 158, 77 S.Ct. 241, 1 L.Ed.2d 211; Secretary of Agriculture of United States v. United States, 347 U.S. 645, 74 S.Ct. 826, 98 L.Ed. 1015; United States ex rel. Arlington & F. Auto R. Co. v. Elgen, 1938, 68 App.D.C. 393, 98 F.2d 264
 
 
 [19]
 United States v. American Sheet & Tin Plate Co., 301 U.S. 402, 408, 57 S.Ct. 804, 81 L.Ed. 1186; United States v. Wabash R. Co., 321 U.S. 403, 408, 64 S.Ct 752, 88 L.Ed. 827; United States v. United States Smelting, Refining & Min. Co., 339 U.S. 186, 189-190, 70 S.Ct. 537, 94 L.Ed. 750
 
 
 [20]
 Allenberg Cotton Co. v. Alabama G.S.R. Co., 298 I.C.C. at 583
 
 
 [21]
 Cf. Armour & Co. v. United States, Ct.Cl.1959, 169 F.Supp. 521